[No. B070428. Second Dist., Div. Seven. May 14, 1996.]

BRIGITTE LaMONTE, Plaintiff and Appellant, v.
SANWA BANK CALIFORNIA, Defendant and Respondent.

510

COUNSEL

Slaff, Mosk & Rudman and Valerie V. Flugge for Plaintiff and Appellant.

Foss & Roberts and Patrick M. Roberts for Defendant and Respondent.

OPINION

LILLIE, P. J.—Plaintiff LaMonte appeals from judgment of nonsuit entered in favor of defendant Sanwa Bank California (Sanwa) in LaMonte's action against Sanwa for allegedly wrongfully handling checks payable to her.[1] LaMonte contends that at trial she presented substantial evidence to permit

---

[1]The case against codefendant E. F. Hutton, involving similar allegations, but separate transactions from those involving Sanwa, was submitted to the jury, which awarded plaintiff

the jury to determine her claims for breach of fiduciary duty and/or conversion.

## FACTUAL AND PROCEDURAL BACKGROUND

In March 1990, LaMonte filed the instant action against Sanwa, asserting numerous causes of action arising out of her allegations that she inherited a 6.5 percent interest in 34,000 acres of real property in Northern California, known as Howard Properties, which generated oil and mineral royalties and other income to its owners; in 1978, the owners of Howard Properties entered into an oral agreement with Sanwa whereby Sanwa was to serve as the collecting and disbursing agent for the various Howard Properties owners; between January 1984 and April 1985, Sanwa mailed to plaintiff's home address various checks drawn on Sanwa and payable to her for her share of the income from Howard Properties; her then husband, Daniel LaMonte, intercepted checks totaling almost $60,000; he deposited the checks, indorsed by him only, in their joint Bank of America account, and then immediately withdrew the funds and misappropriated them for his own use; none of Daniel LaMonte's actions was taken with her knowledge, consent or authorization; Sanwa never notified plaintiff of the improper indorsements, and breached its fiduciary duty to plaintiff by honoring the improperly indorsed checks.

Sanwa answered the second amended complaint, asserting the affirmative defenses of the bar of the statute of limitations and the failure to state facts sufficient to constitute a cause of action. Sanwa admitted, however, that in 1978 it entered into an oral agreement with the various Howard Properties owners to handle the collection of income for Howard Properties and to issue income checks to the various owners, including plaintiff.

In plaintiff's trial brief, she asserted that her theories of recovery against Sanwa were based on Sanwa's role as agent of, and fiduciary for, the owners of Howard Properties. Prior to trial, plaintiff's counsel stated to the court that "We aren't suing Sanwa as a payor bank, we are suing Sanwa as [plaintiff's] agent [and] . . . fiduciary."

---

$22,997 upon finding that E. F. Hutton converted plaintiff's funds and breached its fiduciary duty to plaintiff, but that plaintiff was contributorily negligent. After a judgment on the verdict was entered against Hutton, which awarded plaintiff about $38,000, including interest, plaintiff appealed from the judgment and Hutton cross-appealed. Pending the appeal, plaintiff and Hutton reached settlement and each stipulated to dismissal of the appeal and cross-appeal from the judgment. We accordingly dismissed the appeal and cross-appeal pertaining to the judgment against Hutton, leaving before us only plaintiff's appeal from the judgment of nonsuit as to Sanwa. Further, inasmuch as the transactions involving Sanwa are factually separate from those involving Hutton, we need not set out any facts or issues involving Hutton.

At trial, plaintiff testified that she inherited her interest in Howard Properties when she was 7 years old; she began receiving income from Howard Properties; when she was 18, her income from Howard Properties and other inherited property was about $50,000 to $100,000 per year; she met Daniel LaMonte, who was her own age, when she was in high school in 1979; they married in July 1982, when she was 20 years old; a month before they got married, she lent Daniel $50,000 to invest in the stock market. After their marriage, Daniel monitored their accounts at E. F. Hutton and also organized and reviewed her Howard Properties documents; she paid him $1,300 to $1,500 per month for managing her finances.

In late 1983, plaintiff and Daniel LaMonte opened a joint checking account at Bank of America so Daniel could manage her finances and pay her household bills by writing checks from the Bank of America joint account. According to plaintiff, the clerk who opened their joint account told her that the checks coming into the account would need two signatures; plaintiff never saw any of the monthly statements from their joint account at Bank of America; she assumed Daniel handled them as it was his job.

In March 1985, plaintiff was in the hospital with a ruptured disc in her back, Daniel told her he wanted a divorce and wanted half of her property; he told her he was being blackmailed and that his Mafia friends did not like the way she (plaintiff) treated him; in the hospital, she signed a document giving him a 3 percent interest in Howard Properties, but after litigation against him, she got back the 3 percent interest in late 1988. According to plaintiff, she and Daniel were divorced in April 1985, when he moved out of her house; thereafter, she also discovered that Daniel had been withdrawing funds from her individual account at E. F. Hutton, and then from their joint account at E. F. Hutton, so that at the time of their divorce, almost all of the amount invested at E. F. Hutton, about $160,000, was gone. According to plaintiff, she knew that Daniel had a $10,000 gambling debt during their marriage; several allegedly unauthorized checks which he wrote from the Bank of America account were to pay various Las Vegas casinos.

According to plaintiff, it was in late 1988 that she learned that Sanwa had paid Howard Properties income checks that she had not indorsed; she claimed she never received the proceeds from the checks indorsed by Daniel LaMonte; she understood that the Sanwa checks needed two signatures for deposit into the Bank of America joint account. On cross-examination, however, plaintiff admitted that once the Sanwa checks were deposited into the Bank of America joint account, either she or Daniel could write checks from the account; moreover, nothing in writing limited withdrawals from the account to household expenses only, although she claimed that she mentioned the purpose of the account to the clerk when she set it up at Bank of

America. Plaintiff also admitted that there was no way that Bank of America could have discovered from looking at checks written by Daniel from the account whether it was for an appropriate household expenditure. Further, there was no way for Sanwa to know whether Daniel was writing checks to Las Vegas casinos from the Bank of America account.

The manager of the personal trust department of Sanwa, Annaliese Miller, testified that Sanwa collects royalties and income from various lessees of Howard Properties; upon instructions from the Howard Properties ranch manager, Sanwa pays out insurance, taxes, salaries and expenses and also monthly distributions to the 13 co-owners of the property; after the Sanwa checks sent to plaintiff were negotiated by the collecting bank, Bank of America, the checks were returned to Sanwa's operations center containing the indorsement by Bank of America, "PEG" for prior indorsement guaranteed. Miller met plaintiff only after her divorce from Daniel LaMonte.

Testifying for the defense case, Daniel LaMonte denied there were any limitations on the Bank of America joint account; he also claimed that plaintiff had access to the monthly Bank of America statements and periodically reviewed them; he admitted making about 10 trips to Las Vegas during their marriage. Another defense witness, a Bank of America investigator, testified there are no checking accounts at Bank of America that could be restricted to use for household expenses; a check made out to one joint accountholder can be indorsed by the other joint accountholder and deposited into the joint account.

After plaintiff had rested her case-in-chief, Sanwa made a motion for nonsuit, which the court deferred to the close of all the evidence. After both sides had rested, the trial court stated that as to Sanwa, the theory of liability appeared to be "that the bank had failed to verify that the indorsements on the back of the checks were those of the payees." Plaintiff's counsel responded that "The theory is that it wasn't just a failure to check the indorsements, it was the paying of the checks with improper indorsements by Sanwa . . . . [¶] Sanwa was the bank [both] writing and paying the check."

The court then responded that "as the issuer, you're way too late. You can only be suing Sanwa as an agent." Plaintiff's counsel agreed that plaintiff was suing Sanwa "as an agent" of plaintiff. The court stated that "That's the only way you can sue them, so it really doesn't matter whether they drew the checks on their own bank or used a separate bank. You are not suing them as the issuing bank. If you are, you're light years too late." Plaintiff's counsel then responded: "Well, I understand what you are saying. I guess the theory

is that a trustee who pays property belonging to a beneficiary to someone else or who allows that property to be paid to somebody else is breaching the fiduciary duty. It goes a little bit further than just checking the indorsements." The court then asked, "Well, what other evidence did you introduce as to Sanwa, other than that they failed to check the indorsements on the back of the check?" Plaintiff's counsel responded that "the checks were paid to somebody other than Brigitte LaMonte, and they released funds belonging to Brigitte LaMonte to somebody other than Brigitte LaMonte."

The court responded that "There has been no evidence whatsoever that any check was issued that was not payable to Brigitte LaMonte. . . . [¶] Now, I have asked you to present some authority for the proposition that the issuer, not the issuing bank, but the issuer of a check, . . . assuming the issuer of the check is a fiduciary, is under a duty when those checks are returned to the issuer fiduciary to assure that the person indorsing those checks was somebody authorized to receive them. Do you have any authority for that whatsoever?"

Plaintiff's counsel admitted that "Your Honor, the only authority that I was able to find was that a fiduciary who transfers title to property to somebody other than the beneficiary, breaches the fiduciary duty. I do not have a case where the fiduciary failed to check an indorsement on a check." The court noted that "Sanwa did not transfer title. Sanwa simply issued a check. The check was paid by one bank or another bank. There may have been intermediate banks, that's not our case. And it was ultimately paid by the issuing bank, and Sanwa is not before us as the issuing bank. Mr. Roberts, on behalf of Sanwa, do you wish to make a motion for nonsuit?"

Sanwa's counsel then moved for nonsuit, which the court granted. The court stated that "I would like the minute order to reflect this, that Sanwa as a fiduciary was under no duty to verify that the indorsements on the back of the checks were those of the payees." A July 31, 1992, order for judgment of nonsuit, signed by the court, states in pertinent part that "Plaintiff failed to present any evidence or relevant law to sustain her burden of proof on the following issues and the court finds as a matter of law that: [¶] 1. Any claims by Plaintiff against Sanwa as a payor bank are time barred; [¶] 2. Sanwa, as the collecting and disbursing agent of Plaintiff, had no duty to review or verify that the signature indorsements on the back of the checks issued by Sanwa to Plaintiff as payee, were those of the payee."

Plaintiff filed timely notice of appeal from the judgment of nonsuit.

## I

### STANDARD OF REVIEW

On a motion for nonsuit, the court may not weigh the evidence or consider the credibility of witnesses; instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded; further, the court must give to the plaintiff's evidence all the value to which it is legally entitled. (*Freeman* v. *Lind* (1986) 181 Cal.App.3d 791, 798-799 [226 Cal.Rptr. 515].) " 'In an appeal from a judgment of nonsuit, the reviewing court is guided by the same rule requiring evaluation of the evidence in the light most favorable to the plaintiff. "The judgment of the trial court cannot be sustained unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law." ' " (*Id.* at p. 799.)

"A fiduciary or confidential relationship can arise when confidence is reposed by persons in the integrity of others, and if the latter voluntarily accepts or assumes to accept the confidence, he or she may not act so as to take advantage of the other's interest without that person's knowledge or consent." (*Pierce* v. *Lyman* (1991) 1 Cal.App.4th 1093, 1101-1102 [3 Cal.Rptr.2d 236].) In order to plead a cause of action for breach of fiduciary duty against a trustee, the plaintiff must show the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach; the absence of any one of these elements is fatal to the cause of action. (*Id.* at p. 1101.) The beneficiary of the trust has the initial burden of proving the existence of a fiduciary duty and the trustee's failure to perform it; the burden then shifts to the trustee to justify its actions. (*Van de Kamp* v. *Bank of America* (1988) 204 Cal.App.3d 819, 853 [251 Cal.Rptr. 530].)

In a case where defendant bank was the custodian of custodial agency accounts, it was noted that the "bank's duty as agent is limited to the scope of the agency set forth in the parties' agreement" (*Van de Kamp* v. *Bank of America, supra,* 204 Cal.App.3d at p. 860), and that "[t]he agent is a fiduciary with respect to matters within the scope of the agency." (*Id.* at p. 857.)

We proceed to apply the foregoing principles to the circumstances of this case.

## II

### NONSUIT PROPERLY GRANTED AS TO SANWA

In the instant case, the trial court properly concluded that LaMonte had failed to establish the breach of fiduciary duty by Sanwa. There was no

evidence in this case that Sanwa had either expressly or by implication agreed to supervise or monitor the finances and accounts of LaMonte. Moreover, it is undisputed that the Sanwa checks payable to LaMonte were deposited into her joint account with Daniel LaMonte at Bank of America. Thus, according to well-established law, Sanwa's Howard Properties checks were paid to LaMonte, despite her claims that Daniel's unauthorized withdrawals from the Bank of America account constitute payment to Daniel, and not her.

"What constitutes 'payment' of an instrument depends upon general principles of law. [Citations.] However, California Uniform Commercial Code section 4213 specifically defines what acts shall constitute 'final payment' by a payor bank." (*Pupko* v. *Bank of America* (1981) 114 Cal.App.3d 495, 499 [170 Cal.Rptr. 615].) California Uniform Commercial Code former section 4213 declared an item was "finally paid" by a payer bank when it has (1) paid the item in cash or (2) settled for the item without having a right to revoke the settlement under a statute, clearinghouse rule, agreement or reservation thereof. (114 Cal.App.3d at p. 499.) To "settle" was defined in California Uniform Commercial Code former section 4104, subdivision (1)(j), as "to pay in cash by clearinghouse settlement, in a charge or credit or by remittance, or otherwise as instructed. A settlement may be either provisional or final."

Under the undisputed facts in this case, the deposit of the Sanwa checks into the Bank of America joint account and Sanwa's subsequent payment on the checks when presented by Bank of America constituted final payment. Inasmuch as Sanwa did not contend that merely *mailing* the checks constituted payment, we find without merit appellant's argument that "The mailing of the Sanwa-Howard checks to appellant does not constitute 'payment.' "

It is also clear that Daniel was authorized by LaMonte to handle her finances and write checks on the Bank of America joint account; what was not authorized by LaMonte was Daniel's withdrawal of funds from the joint Bank of America account for nonhousehold purposes, including his gambling debts. Appellant failed to present any evidence that Sanwa was retained to advise LaMonte in any personal financial matters or to monitor her accounts at other institutions. Thus, there is no evidence to support the assertion that Sanwa had agreed to undertake a duty to check the indorsements on the returned Howard Properties checks to make sure that they were deposited into any particular account of LaMonte's.

Thus, LaMonte fails to cite any applicable authority that the Sanwa checks were not paid to her; indeed there is no authority cited that the deposit of the

Sanwa checks by a payee into a joint account of the payee and another person cannot constitute payment to the payee. Moreover, there is no evidence introduced in this case that it was any concern of Sanwa, or a matter relating to any duties it had agreed to undertake, whether LaMonte deposited the Sanwa checks into an individual account or a joint account. LaMonte's arguments with respect to the deposit of the Sanwa checks into the Bank of America joint account are essentially premised on the claim that Sanwa had a duty to act as her financial advisor, or to monitor her accounts in other institutions, when there was no evidence of such an agreement to so act.

The authorities cited by LaMonte are not instructive or pertinent to this case and do not support her claim that the Howard Properties checks were paid to Daniel and not to her. In *Schneider* v. *Union Oil Co.* (1970) 6 Cal.App.3d 987 [86 Cal.Rptr. 315], the court of appeal reversed a judgment of dismissal entered upon the sustaining of a demurrer on the ground that the statute of limitations did not bar plaintiff's complaint to establish herself as a stockholder of defendant where plaintiff alleged that the statute was tolled by her ignorance of defendant's unauthorized transfer of her shares of stock upon her forged signature. *Schneider* does not support appellant's argument that Sanwa is "strictly liable for failing to pay appellant her funds." Accordingly, the facts do not establish any conversion or payment of the Howard Properties checks to Daniel.

Nor does *Lee* v. *Escrow Consultants, Inc.* (1989) 210 Cal.App.3d 915 [259 Cal.Rptr. 117], support appellant's claim that Sanwa had a duty to verify the indorsements on the checks. In *Lee*, the court of appeal reversed a judgment entered after sustaining a demurrer to a complaint alleging that defendant escrow holder breached its fiduciary duty and was negligent in honoring an amendment to escrow instructions to disburse plaintiff's funds to the sellers when the amendment bore plaintiff's forged signature. The court stated that "the wrongful conduct alleged in the present case relates to defendant's failure to carry out the escrow instructions by disbursing funds pursuant to a forged amendment. As explained above, the original escrow instructions provided that 'No Notice Demand or Change of Instructions Shall Be of Any Effect in This Escrow Unless Given in Writing by All Parties Affected Thereby.' . . . Verification is not the equivalent of an accusation of wrongdoing. Thus, an escrow holder who verifies a signature in order to ensure it is complying with the terms of the escrow instructions is not subjecting itself to the risk of suit. We, therefore, conclude that the limited nature of an escrow holder's duty does not preclude plaintiff from stating a cause of action." (210 Cal.App.3d at p. 924.)

*Lee* is inapposite to the instant case because there is no evidence that Sanwa undertook any obligation to ensure that the Howard Properties checks

payable to appellant were deposited into any particular account owned by her; under the circumstances of this case, the only reasonable inference from the evidence was that it was reasonable for Sanwa to rely upon Bank of America's "PEG" stamp upon the checks rather than fail to pay them or to question the lack of appellant's signature and perhaps cause appellant's checks written on the Bank of America account to be returned for insufficient funds. Further, there was absolutely no evidence presented in this case that Sanwa was placed on notice of any unauthorized indorsements with respect to its checks payable to appellant, or indeed was placed on notice of any unauthorized conduct pertaining to the checks.

To support her claim that there was evidence in this case that the Howard Properties checks on their face did not bear proper indorsements for deposit into the Bank of America account, appellant points to testimony of defense witness Amy Yukawa, a Bank of America employee, that a check made payable solely to Brigitte LaMonte, indorsed solely by Dan LaMonte, would not bear proper indorsements.[2] However, it is clear from her further testimony that such a check would have been accepted by Bank of America for deposit into a joint account owned by both Dan and Brigitte LaMonte. Moreover, on further cross-examination, Yukawa changed her testimony. After Yukawa was presented with the Bank of America joint accountholder agreement, she was asked: "My question is, having read the language, does that refresh your memory as to whether one of the account signers on a joint bank account could sign a check made payable to another account signer and deposit it into the account?" Yakawa answered: "To my knowledge, yes." Accordingly, there was insufficient evidence in this case that the Howard Properties checks were improperly indorsed for deposit into appellant's Bank of America joint account.

We also conclude that LaMonte failed to establish any breach of fiduciary duty or negligence on the part of Sanwa in paying the Howard Properties checks which did not contain her signature as indorsement. California Uniform Commercial Code former section 4205, subdivision (1), which was

---

[2]LaMonte's counsel asked of Yukawa the following question: "Let me give you one other situation. Dan LaMonte and Brigitte LaMonte are the joint account owners. A check is made payable to Brigitte Donahoo LaMonte and endorsed by Dan LaMonte and presented for deposit into that joint account. Is that check properly endorsed?" Yukawa answered, "I would say not." The court then asked what Bank of America would do with such checks. Yukawa responded, "[I]n the case of the last one they probably would—should return it. Because it should have been signed whatever, Brigitte Donahoo, and then signed Brigitte LaMonte, to make sure that they were, you know, one person." The court then asked Yukawa to "Assume that the name of the account contained both names. That is Donahoo and [Brigitte Donahoo LaMonte]." Yukawa answered that "Then it would have been accepted." The court stated that "So you're not concerned so much, if I understand you, with the form of the endorsement but making sure that it is going into the right account?" Yukawa responded, "Okay."

repealed in 1992, but which was applicable to the events in this case, provided that "A depositary bank which has taken an item for collection may supply any indorsement of the customer which is necessary to title unless the item contains the words 'payee's indorsement required' or the like. In the absence of such a requirement a statement placed on the item by the depositary bank to the effect that the item was deposited by a customer or credited to his account is effective as the customer's indorsement."

In *Cooper* v. *Union Bank* (1973) 9 Cal.3d 371 [107 Cal.Rptr. 1, 507 P.2d 609], wherein the court upheld a judgment in favor of defendants, payor banks that had paid checks with forged indorsements, it was recognized that "Nothing on the face of the instruments would have led the bank to suspect they were irregular in any way. A single branch of a large bank, as the testimony indicated, may handle several thousand instruments bearing third party endorsements in a single day. Considering this burden, it would be commercially unreasonable to expect payor banks to undertake foolproof efforts to verify ostensibly valid endorsements. Crocker's diligence with respect to the check received through bank collection channels is, of course, particularly evident, inasmuch as Crocker apparently received the instrument with all prior endorsements guaranteed by the collecting banks. Having acted in good faith and in accordance with reasonable commercial standards, Crocker is therefore entitled to invoke the defense of section 3406." (*Id.* at pp. 385-386.)[3]

Thus, it has been stated that a collecting bank warrants to the payor bank that the collecting bank has good title to the item (Cal. U. Com. Code, former § 4207, subd. (1)(a)), and refers to the validity of the chain of necessary indorsements, and more specifically, that the instrument presented contains all necessary indorsements and that such indorsements are genuine and otherwise effective; the statute imposes strict liability on the collecting bank, since that bank, having presumably confronted the indorser, is best able to assure the validity of the indorsement. (*Sehremelis* v. *Farmers & Merchants Bank* (1992) 6 Cal.App.4th 767, 773 [7 Cal.Rptr.2d 903].)

A bank "is authorized to honor withdrawals from an account on the signatures authorized by the signature card, which serves as a contract between the depositor and the bank for the handling of the account. So long as the checks drawn on the account are signed in conformity with the

---

[3]California Uniform Commercial Code former section 3406 provided that "Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business."

signature card, and absent any knowledge of a misappropriation, the bank is free from liability for honoring a check drawn in breach of trust. (Fin. Code, §§ 952, 953 . . . .)" (*Blackmon* v. *Hale* (1970) 1 Cal.3d 548, 556 [83 Cal.Rptr. 194, 463 P.2d 418].)

Thus, it has been held that under the predecessor to Financial Code section 953, a bank was justified in presuming that checks drawn to the order of an agent of the depositor were authorized, as the agent, who was authorized to sign his principal's checks, "could have drawn any or all of these checks payable to himself, cashed them in currency, and met the drafts therewith. Regardless of whatever suspicion might have lurked in the mind of the teller as to the destination of the proceeds, no duty of inquiry would have been cast on the bank." (*Boston Ins. Co.* v. *Wells Fargo Bank* (1947) 80 Cal.App.2d 59, 66 [181 P.2d 84].) Accordingly, it has been held that "Commercial banks have no duty to police their fiduciary accounts." (*La Vista Cemetery Assn.* v. *American Sav. & Loan Assn.* (1970) 12 Cal.App.3d 365, 369 [90 Cal.Rptr. 722].)

■ Moreover, inasmuch as "a principal is liable to third parties not only for the negligence of its agent in the transaction of the business of the agency, but likewise for the frauds, torts or other wrongful acts committed by such agent in and as part of the transaction of such business" (*Otis Elevator Co.* v. *First Nat. Bank* (1912) 163 Cal. 31, 39 [124 P. 704]), "[t]here is no such particular relation existing between a bank and its customers that denies the application of the general rules of agency which apply in other relations. The commercial business of to-day is largely done through the medium of banks and the free use of checks and other commercial paper. . . . [A]nd we are unable to perceive why when an agent of a customer of a bank while acting in the course of the employment with which the customer has entrusted him commits a fraud upon the bank, the same rule of responsibility for the fraudulent conduct of the agent under such circumstances should not apply, as it applies to other relations between parties where the acts of the agent in the course of his employment are involved." (*Id.* at pp. 46-47.)

■ In light of the foregoing, it is clear that Bank of America would have been under no duty to inquire as to the disposition of funds withdrawn by appellant's agent and joint accountholder, her husband. Thus, if Bank of America, the bank handling the collection of the Howard Properties checks, has no duty of inquiry, we cannot posit any such duty on Sanwa, which paid the checks when presented with Bank of America's "PEG" warranty and which had no knowledge of the disposition of the proceeds from those checks. Accordingly, we conclude that appellant fails to establish with any

pertinent authority that the circumstances in this case create a duty for Sanwa to verify the indorsements on the Howard Properties checks payable to appellant before paying the checks. In light of the fact that appellant fails to establish the foregoing duty, we necessarily conclude that appellant fails to establish that "Sanwa breached its duty of full disclosure" with respect to such indorsements. To the extent that appellant charges Sanwa with a duty to investigate appellant's Bank of America account and make disclosures to her with respect to such account, no pertinent authority is cited to impose such a duty on Sanwa. Two cases cited by appellant dealing with stockbroker misconduct and the failure to disclose all risks attendant on investments or to provide statements of customer accounts are simply inapposite. (See *Twomey* v. *Mitchum, Jones & Templeton, Inc.* (1968) 262 Cal.App.2d 690 [69 Cal.Rptr. 222]; *Hobbs* v. *Bateman Eichler, Hill Richards, Inc.* (1985) 164 Cal.App.3d 174 [210 Cal.Rptr. 387].)

Finally, appellant's reliance on California Uniform Commercial Code former section 4406[4] is misplaced, inasmuch as that statute cannot be construed to have placed on Sanwa a duty to verify the indorsements at issue here. Appellant argues that by analogy to California Uniform Commercial Code former section 4406, "a trustee has at least the duty of care of trust money as a trustee would have to his or her own funds. That means that the duty to report unauthorized indorsements would be the minimum standard [to which] a trustee is held." As applied to the instant case, and deeming the trust department of Sanwa to be a "customer" or drawer of checks on Sanwa Bank, the payor bank, the instant case raises no issue under former section 4406, which deals with the relationship between a bank and its customer. There is no evidence of any alteration of the Sanwa checks or any unauthorized signature of Sanwa. Moreover, subdivision (4) is inapplicable in that Sanwa as the drawer of the check is not attempting to assert against any bank the existence of any unauthorized indorsement. Appellant offers no persuasive reasoning to support her claim that former section 4406, subdivision (4),

---

[4]That section provided in pertinent part that "(1) When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after the discovery thereof. [¶] . . . [¶] (4) Without regard to care or lack of care of either the customer or the bank a customer who does not within one year from the time the statement and items are made available to the customer (subdivision (1)) discover and report his unauthorized signature or any alteration on the face or back of the item or any unauthorized indorsement, and if the bank so requests exhibit the item to the bank for inspection, is precluded from asserting against the bank such unauthorized signature or indorsement or such alteration. The burden of establishing the fact of such unauthorized signature or indorsement or such alteration is on the customer." (Cal. U. Com. Code, former § 4406.)

should apply by analogy to create a duty running from Sanwa in its capacity as a trustee disbursing income from Howard Properties to her as beneficiary of such income.

Inasmuch as appellant has failed, as she failed below, to establish with any authority and evidence, the existence of a fiduciary duty and breach by Sanwa of such duty, she fails to establish that the trial court erred in granting Sanwa's motion for nonsuit. We must therefore affirm the judgment.

## DISPOSITION

The judgment of nonsuit is affirmed. Sanwa is entitled to its costs on appeal.

Johnson, J., and Woods (Fred), J., concurred.