[No. C035975. Third Dist. Oct. 24, 2001.]

MARVIN L. OATES, Plaintiff and Appellant, v.
CITY OF LINCOLN et al., Defendants and Respondents.

**COUNSEL**

Law Offices of Edward R. Brenner and Edward R. Brenner for Plaintiff and Appellant.

McDonough, Holland & Allen, G. Richard Brown, Harriet A. Steiner and Ethan Walsh for Defendants and Respondents.

**OPINION**

**RAYE, J.**—Assessment bonds provide a means for private property owners to borrow, and to pay over time for, the costs of public infrastructure benefiting their property. In tandem with assessment bonds, reserve bonds are issued as a means of providing bondholders with a degree of assurance that debt service due on the assessment bonds will be paid in the event of credit difficulties.

Plaintiff Marvin L. Oates, a property owner (but not a bondholder), filed suit against defendants City of Lincoln (City) and the Lincoln Public Financing Authority (Authority), alleging the City and the Authority misused reserve funds he had paid into when they refinanced eight bonds under the Marks-Roos Local Bond Pooling Act of 1985 (Marks-Roos Act). (Gov. Code, § 6584 et seq.) Oates claimed defendants' actions constituted an unconstitutional taking, and defendants committed constructive fraud by violating their fiduciary duty to him. The trial court granted summary judgment, finding as a matter of law that Oates had no legal interest in the bond issue reserve funds. Oates appeals, contending assessed property owners possess an interest in the reserve fund sufficient to support both a takings and a constructive fraud claim. We shall affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

In 1986 the City established the Nicolaus Road Assessment District (District) and issued bonds known as "Improvement Bonds, City of Lincoln,

Nicolaus Road Assessment District" in the amount of $5,885,510.47. Liens against properties within the District secured the bonds. The District levied and collected assessments against the properties to pay the principal and interest due. The bonds were 15-year bonds scheduled to be repaid by September 2001. From 1995 through 2001 the interest rate on the bonds increased from 7.3 percent to 8.0 percent. At issuance, 10 percent of the bond proceeds—$588,551.04—was placed in a reserve fund for the benefit of the bondholders.

Oates purchased property in the District in 1989. In 1994 the City and the Authority refinanced eight outstanding debt issues of the City, including those of the District.[1]

The City and its redevelopment agency created the Authority to provide financing for public capital improvements, acquire such improvements, and/or purchase local obligations through a Marks-Roos Act bond pool. The eight outstanding City debts were refinanced, and the Authority purchased the new refinanced bonds. The Authority issued one "pooled" larger bond issue, which was sold to bondholders. Instead of creating eight separate reserve funds, one for each of the eight separate issues, the City created one reserve fund for the benefit of the bondholders.

The refinancing and subsequent reissue carried costs, including the cost of the underwriter, bond counsel, and financial advisor; administrative fees; and miscellaneous costs of preparation. The proceeds of the bond sale paid these costs of issuance.[2]

In connection with the refunding, the outstanding debt and reserve funds for each issue, including the District, were reviewed and verified. As of April 1994 the review of the District revealed $551,100 in the reserve fund.[3] As part of the refunding, the entire Nicolaus Road reserve fund was used to reduce the outstanding principal on the District bonds.

The total outstanding principal due from the property owners within the District dropped from $3,745,000 to $3,725,000. The interest rate on the

---

[1]The eight issues consisted of six public issues (airport, water, solid waste, wastewater, general, and agency loan) and two private issues (Lincoln Airpark Assessment District and Nicolaus Road Assessment District).

[2]Oates, in his opening brief, alleges complicity between the city manager, Mr. Malinen, and Mr. Richardson of First California Capital (FCC), the recipient of a consulting fee and discounts in the amount of $531,250. Oates contends Richardson convinced Malinen, with whom he had a previous acquaintance, to not merely refinance the Nicolaus Road assessment but to create the larger pool. The more ambitious project, Oates argues, brought FCC a larger fee. However, Oates points to no evidence in support of his contentions.

[3]The review calculated the reserve fund contained $567,089. The City transferred $15,989 in City funds into the redemption fund for the Nicolaus Road 1994 refunded bonds to prepay 1994 bonds. The difference equals $551,100.

bonds dropped from a range of 7.3 percent to 8.0 percent to a range of 6.1 percent to 7.95 percent with the same maturity date.

Pursuant to the 1994 refinancing, the city council made findings required by Streets and Highways Code section 9525.[4] The council found: (1) the estimated amount of each annual installment of principal and interest on the reassessment is less than the corresponding amount of the installment of the original 1986 assessment; (2) the number of years to maturity of the refunding bonds is not more than the number of years to the last maturity of the original 1986 bonds; and (3) the principal amount of the reassessment on each subdivision of land within the District is less than the unpaid principal amount of the portion of the 1986 assessment being superseded and supplanted by the same percentage for each subdivision of land within the District.

Oates filed suit in April 1995, requesting an accounting and declaratory relief and alleging constructive fraud. Defendants demurred to Oates's first amended complaint, arguing the statutes of limitations contained in Code of Civil Procedure sections 860 to 870 barred all causes of action. The trial court sustained the demurrer without leave to amend.

Oates appealed and we affirmed the trial court's ruling as to the second and fourth causes of action, which challenged the validity of the pooled bond financing. (*Oates v. City of Lincoln* (May 3, 1999, C023340) [nonpub. opn.].) We found these causes of action barred by the 60-day statute of limitations for legal challenges to bond issuances. We reversed the trial court's judgment as to actions for accounting, declaratory relief, constructive trust, and constructive fraud, finding these causes of action did not challenge the validity of the pooled bond issuance.

Oates filed a second amended complaint, alleging causes of action for unconstitutional taking, constructive fraud, and an accounting of the reserve fund. Defendants filed a summary adjudication motion as to all three causes of action in the second amended complaint.

The trial court granted the motion as to all three causes of action. The court found ". . . plaintiff does not materially dispute the evidence submitted by defendants. . . . That evidence shows that the reserve fund was used to reduce the principal amount owed on the Nicolaus Road bonds prior to the refinancing in 1994. Thus, plaintiff cannot show an illegal taking or show that moving defendants breached any fiduciary duty in the administration of

---

[4]All further statutory references are to the Streets and Highways Code unless otherwise indicated.

the reserve fund. Finally, an accounting has already been done, rendering plaintiff's first cause of action moot." Following entry of judgment, Oates filed a timely notice of appeal.

## DISCUSSION

### I

On appeal from a summary judgment, our assessment involves the same three-step analysis applicable in the trial court. We first identify the issues framed by the pleadings since it is these allegations to which the motion responds. Second, we determine whether the moving party's showing has established facts that negate the opponent's claim and justify a judgment in movant's favor. Third, we determine whether the opposition demonstrates the existence of a triable, material factual issue. (*Todd v. Dow* (1993) 19 Cal.App.4th 253, 258 [23 Cal.Rptr.2d 490].)

In reviewing an order granting summary judgment, we assume the role of the trial court and redetermine the merits of the motion. We strictly scrutinize the moving party's papers; however, we liberally construe the declarations of the party opposing summary judgment to determine the existence of triable issues of fact. All doubts as to whether any material, triable issues of fact exist are to be resolved in favor of the party opposing summary judgment. (*ML Direct, Inc. v. TIG Specialty Ins. Co.* (2000) 79 Cal.App.4th 137, 140-141 [93 Cal.Rptr.2d 846].)

### II

We begin by reviewing the statutory scheme underlying the present litigation. Sections 8880 through 8887 govern the formation and administration of special reserve funds.

Section 8880 provides for the creation of a reserve fund: "In any proceedings leading to the issuance of bonds pursuant to this division, the legislative body may include, as an incidental expense of the proceedings, an amount to create a special reserve fund for the bonds. [¶] The amount so provided shall not exceed 10 percent of the total amount of assessments to be levied under the proceedings."

Section 8881 provides that any amount paid by an assessment district for cash payment of assessments prior to issuance of bonds, or as advance payment of assessments following issuance, shall proportionately reduce the

assessments in an amount equal to the ratio of the total initial reserve fund to the total amount assessed.[5]

Section 8882 outlines the relationship between the bondholders and the reserve fund: "Upon receipt of the bond sale proceeds, the amount so provided for the special reserve fund pursuant to Section 8880 shall be transferred to the fund. [¶] The special reserve fund shall be identified by the name of the proceedings under which the bonds are issued and shall constitute a trust fund for the benefit of the bondholders, subject to and to be administered in accordance with the provisions of this part."

Section 8884 states: "Whenever an assessment is paid off following the issuance of bonds, there shall be transferred, from the special reserve fund to the redemption fund, an amount equal to the reduction in the assessment determined pursuant to Section 8881."

Under section 8885, when the balance of a reserve fund is sufficient to retire all remaining outstanding bonds, collection of principal and interest on the assessment ceases and the special reserve is liquidated in retirement of the bonds. Section 8885 also provides that, in the event the amount of the reserve fund is in excess of the amount necessary to retire bond debt, contributing property owners receive their proportionate share in cash unless the excess is less than $1,000. If the excess is less than $1,000 then it may go to the entity's general fund.[6]

---

[5]Section 8881 states: "Where a special reserve fund is created for a bond issue, the assessment levied on any parcel for the payment of the bond issue shall be reduced upon the payment, in whole or in part, of the assessment pursuant to provisions for either (1) cash payments of assessments prior to the issuance of the bonds or (2) advance payment of assessments following the issuance of the bonds. [¶] The proportional reduction on the assessment shall equal the ratio of the total amount initially provided for the special reserve fund to the total amount originally assessed in the proceedings for the bond issue."

[6]Section 8885 states: "Whenever the balance in the special reserve fund is sufficient to retire all remaining outstanding bonds in the issue, whether by advance retirement or otherwise, collection of the principal and interest on the assessments shall be discontinued and the special reserve fund shall be liquidated in retirement of the bonds. [¶] In the event that the balance in the fund at the time of liquidation exceeds the amount required to retire all outstanding bonds in the issue, the excess shall be apportioned to each parcel upon which the individual assessment remained unpaid at the time the balance in the reserve fund was sufficient to retire all outstanding bonds in the issue. The payments shall be made in cash to the respective owners of the parcels except that, if the excess is not greater than one thousand dollars ($1,000), the excess may be transferred to the general fund of the entity conducting the proceedings."

Section 8886 specifies that any income realized from the investment of the special reserve fund shall be credited to the reserve fund.[7]

Section 8887 provides that, to assure that bonds to be issued do not become arbitrage bonds and to provide for reduction of money in the reserve fund, the legislative body may use reserve funds to either: (1) credit upon assessments pursuant to section 10427.1, and/or (2) transfer to the redemption fund for advance retirement of the debt.

Section 9520 allows any city that issued bonds outstanding under the Marks-Roos Act to determine by resolution that the public interest or necessity requires the refunding of the issue of the bonds. Section 9521 allows for two or more issues of bonds to be refunded in one proceeding and only one issue of refunding bonds to be secured by all of the reassessments levied in lieu of the original assessments. Section 9523 requires a report containing certain pertinent information about the refunding.

Section 9525, at issue in the present case, states in pertinent part: "(a) If the legislative body finds that all of the following conditions are satisfied, it may approve and confirm the report prepared pursuant to Section 9523 and proceed to authorize, issue, and sell refunding bonds pursuant to Chapter 3 . . . . [¶] (1) That each estimated annual installment of principal and interest on the reassessment . . . is less than the corresponding annual installment of principal and interest on the portion of the original assessment being superseded and supplanted, as set forth in subdivision (c) of Section 9523, by the same percentage for all subdivisions of land within the district. Any amount added to the annual installments on the reassessment due to a delinquency in payment on the original assessment need not be considered in this calculation. [¶] (2) That the number of years to maturity of all refunding bonds is not more than the number of years to the last maturity of the bonds being refunded. [¶] (3) That the principal amount of the reassessment on each subdivision of land within the district is less than the unpaid principal amount of the portion of the original assessment being superseded and supplanted by the same percentage for each subdivision of land within the

---

[7]Section 8886 states: "Money in the special reserve fund may be temporarily invested in any authorized investments pursuant to . . . Section 53600 [et seq.] of the Government Code, or in any authorized investments pursuant to law in the case of money resulting from assessments levied for bonds authorized to be issued after the effective date of the amendments to this section enacted during the 1981-82 Regular Session of the Legislature, provided that the maturities thereof shall not be later than the date on which the money may be required for the redemption fund pursuant to this part. [¶] Any income realized from such investments shall be credited to the special reserve fund, and any loss or expense resulting from such investment shall be charged to that fund."

district. Any amount added to a reassessment because of a delinquency in payment on the original assessment need not be considered in this calculation."

## III

Oates contends the property owners assessed have an interest, actual and defined, in the bond reserve fund. According to Oates, the reserve fund has a priority of use: first, the protection of bondholders and, second, to benefit assessment district members who paid their assessments. Under Oates's interpretation, the reserve fund is to be treated for the benefit of those whose payments created it if it is no longer necessary to protect bondholders from default. Oates contends the City transformed his interest in the bond reserve fund into a City asset "by a calculated, albeit creative, exercise in formalistic redesignation."

Central to Oates's argument is section 8885, which mandates that when the balance in the reserve fund is sufficient to retire the outstanding bonds, assessment collection will be discontinued and any surplus over $1,000 shall be paid in cash proportionately to the property owners.

In opposing the City's summary judgment motion, Oates submitted a declaration by Robert W. Doty, an expert on bond refinancing. Doty reviewed section 8885 and concluded "the local government holds the reserve fund not only for the benefit of bondowners (in the event private property owners *fail to pay* assessments), but also as the foundation for the credit to or reduction in assessments on the private parcels (in the event that the private property owners *do make payment* of their assessments). [¶] . . . *Thus, the local government holds the reserve fund, if it is not needed to pay bondowners, specifically for the benefit of the property owners.*"

The City, in response, points out any refund or credit realized by a property owner under section 8885 *is contingent* on a series of events. As the City points out: "[Oates] had nothing more than an expectancy of a lower payment. [Oates] would only receive this lower payment *if* he never defaulted and *if* he paid the entire assessment to the bondholders. Until both those events took place, [Oates] had no property interest in the reserve fund. [Oates] has no property right in this potential expectancy."

We agree with the City's assessment of the statute. Unless and until the bondholders were satisfied, property owners possessed no interest in the

reserve fund, only a possible future interest dependent on future events. Under section 8882, the special reserve fund constitutes a trust fund for the benefit of the bondholders. Until satisfaction of this obligation to the bondholders, no interest resides in the property owners.

Oates, in his reply brief, protests that such a construction allows for manipulation and self-dealing by the City. Oates argues: "Even if [Oates] were to concede that his interest was merely contingent, who would have predicted that the City would manipulate a Mark-Roos issue to preclude a contingency from occurring, the bondholders being satisfied, so that it could contend the reserve fund would not act as a credit. Who would have predicted that City would use the fund as part of a self-dealing transaction."

Although Oates presents the City's ability to refund as unfettered, the statutory scheme imposes strict requirements before any refunding can occur. (§ 9525.) The statutory scheme might not enable one to predict when an entity will decide to refund a bond issue, but it does restrict the conditions under which an entity can create a pool of bonds to be refunded.

The City, in moving for summary judgment, presented evidence of compliance with Streets and Highways Code section 9525: the findings made by the city council. However, Oates focuses on Government Code section 6586, which recites the purposes of the Marks-Roos Act.[8] This analysis misses the point: to refinance and pool bonds, an entity must comply with section 9525. The City in the present case provided evidence of such compliance.

Oates presents an abbreviated challenge to the City's findings, arguing the refinance raised his assessments and increased the years to maturity. However, Oates's calculations necessitate inclusion of the credit he believes the City owes him from the Nicolaus Road reserve fund. Only if the credit is factored into the equation can Oates claim to be financially worse off after the refinance.

The credit Oates claims consists of the proceeds in the Nicolaus Road reserve fund at the time of the refinance plus interest. As the trial court found, and Oates concedes, the City presented evidence that it used these proceeds of the reserve fund "to reduce the principal amount owed on the

---

[8]Government Code section 6586 lists four purposes underlying the legislation: (1) providing the issuing entity with substantial savings in interest rates, issuance costs, and administrative expenses; (2) reducing user costs and fees; (3) providing employment benefits; and (4) increasing the efficiency of the delivery of services to the citizens.

Nicolaus Road bonds prior to the refinancing . . . ." Once the reserve fund paid down part of the principal, the Nicolaus Road property owners, in effect, received the benefit of the sums they paid into the reserve fund. The outstanding principal on the bonds was pooled with the other bonds in the 1994 refinancing. Oates's dissatisfaction with the resulting costs of the refinance does not translate into noncompliance with section 9525.

IV

■ Oates also alleges the City committed constructive fraud by breaching a fiduciary duty by misusing the reserve funds. The City contends its holding of the reserve funds failed to create a fiduciary relationship between Oates and the City since Oates possessed no interest in the fund.

" 'A fiduciary or confidential relationship can arise when confidence is reposed by persons in the integrity of others, and if the latter voluntarily accepts or assumes to accept the confidence, he or she may not act so as to take advantage of the other's interest without that person's knowledge or consent.' [Citation.] In order to plead a cause of action for breach of fiduciary duty against a trustee, the plaintiff must show the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach; the absence of any one of these elements is fatal to the cause of action. [Citation.] The beneficiary of the trust has the initial burden of proving the existence of a fiduciary duty and the trustee's failure to perform it; the burden then shifts to the trustee to justify its actions. [Citation.]" (*LaMonte v. Sanwa Bank California* (1996) 45 Cal.App.4th 509, 517 [52 Cal.Rptr.2d 861].)

As the City points out, a fiduciary relationship requires that one party control some interest of the other party. Although the City exercises control over a reserve fund established pursuant to section 8880, the City argues that only the bondholders, for whose protection the reserve is established, possess an interest in the fund. We agree.

Section 8882 specifically labels the reserve fund "a trust fund for the benefit of the bondholders." Oates concedes the fund exists for the benefit of the bondholders but argues: "But, if the bonds are not in default, and, if the bonds are satisfied, is there anyone <u>but the property owners</u> to whom a duty could be owed?" Again, this argument overlooks the contingent quality of any interest the property owners possess. The property owner *might*, at some future time, realize a return from the fund, but only if the bondholders are

satisfied and the reserve contains more than $1,000. We agree with the trial court and find no fiduciary relationship between the property owners and the City that administers the reserve fund.

## DISPOSITION

The judgment is affirmed. Defendants shall recover costs on appeal.

Sims, Acting P. J., and Davis, J., concurred.