**Mark GELOW, et al., Plaintiffs,**

v.

**CENTRAL PACIFIC MORTGAGE CORPORATION, et al., Defendants.**

**No. CIV. S–07–1988 LKK/KJM.**

United States District Court, E.D. California.

Aug. 28, 2009.

Jeff Reich, Shane Reich, Reich Law Firm, Fresno, CA, for Plaintiffs.

Kristina Marie Launey, Mark Henry Van Brussel, Seyfarth Shaw LLP, Sacramento, CA, for Defendants.

### ORDER

LAWRENCE K. KARLTON, Senior District Judge.

Plaintiff Mark Gelow and ten other individuals have brought suit against their former employer, Central Pacific Mortgage Company[1] ("CPM"); its subsidiary, Ivanhoe Financial, Inc. ("Ivanhoe"); and former executive officers of the two companies, John Courson, John Cassell, and Ed Fuchs. Plaintiffs allege that defendants breached their fiduciary duty under ERISA, 29 U.S.C. § 1132, violated the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, and are liable for fraud, conversion, and breach of fiduciary duties under state law. In the instant motion, defendants Courson, Cassell, and Fuchs move for summary judgment on all causes of action. For the reasons stated below, the court now grants in part and denies in part the motion.

### I. FACTS[2]

CPM was a California corporation that performed residential mortgage lending through its branch offices in California and elsewhere. Defendant Courson was CPM's President and Chief Executive Officer from 1990 to 2007, when CPM closed. Beginning in 2000, he was also its sole owner and shareholder. Defendant Cassell was Senior Vice President and Chief

---

1. As the court observed in its February 14, 2008 order, although the plaintiffs named "Central Pacific Mortgage Corporation" as the defendant, the entity is actually named Central Pacific Mortgage Company. Plaintiffs apparently do not dispute this. *See* Pls.' Statement of Disputed and Undisputed Facts ¶ 1.

2. All facts are undisputed unless otherwise noted. Each party has objected to several items of the other's evidence. Many of these relate to evidence not relied on by the court in ruling on the instant motion. To the extent that the evidence is relied on, the objections are OVERRULED, except as to defendants' objection to the Declaration of Mark Gelow, discussed *infra* in note 9.

Financial Officer from 1994 to 2001, at which time he became Executive Vice President of Operations and Administration. Defendant Fuchs was Vice President of Accounting of CPM beginning in 1995 and became Senior Vice President of Finance in 2002 and then Executive Vice President of Finance in 2005.

CPM had branches that originated mortgage loans with borrowers, which it bundled and sold to investors, and other branches that purchased mortgage loans from third-party brokers. Revenues from the bundled and resold loans were used to repay the amount CPM had borrowed to fund the loans, with the surplus used to pay CPM's expenses, including salaries. This surplus was credited to the branch originating the loan that was funded and tracked in CPM's general ledger accounting system.

Each of the plaintiffs are former CPM branch managers. The branch managers were employees of CPM and, accordingly, all of the plaintiffs signed a Branch Manager Employment Agreement upon attaining that position. Defendants have tendered the employment agreements for some of the plaintiffs, which provide that the agreement as written constitutes the entire employment agreement between the plaintiff and CPM. *See* Decl. of Kristina Launey In Support of Defs.' Mot. to Compel Arbitration, Ex. A–G. They also provided that the agreement could only be modified by a signed writing. The agree-

ments set forth the branch manager's compensation. According to the agreements, the branch manager could draw a salary based on the net profit of his or her branch.[3] It is undisputed that the branch managers had unfettered access to the branch's net profits and could receive his or her compensation at intervals and in amounts that he or she wished, although they were required to draw a salary of at least $1,100 per pay period.[4] Each manager received a monthly statement setting forth the branch's account balance.

## A. The Branch Accounts

The central dispute between the parties concerns the proper characterization of these funds. There is no dispute that the amount of these funds would naturally fluctuate based on the branch's revenues and expenses at any given time. Defendants contend that the funds were never kept in segregated accounts, but simply represented the maximum amount that the branch managers could draw down. Decl. of John Courson In Support of Defs.' Mot. for Summ. J. ("Courson Decl.") ¶ 8; Decl. of Ed Fuchs In Support of Defs.' Mot. for Summ. J. ("Fuchs Decl.") ¶ 6. Plaintiffs do not dispute that this was the defendants' policy, *see* Pls.' Response to Defs.' Undisputed Material Facts ¶¶ 50, 52, but contend that the branch net profits were represented to be the branch managers' property and could only be used by

---

**3.** It is also undisputed that CPM offered its employees group health benefits and a 401(k) retirement plan administered by Merrill Lynch.

**4.** Plaintiffs state that they dispute this fact, but have tendered no evidence in support of that contention. *See* Pls.' Response to Defs. Statement of Undisputed Fact ¶ 89. Elsewhere, plaintiffs' evidence supports this fact. *See* Gelow Delc. ¶ 5 ("Defendants Courson, Cassell and Fuchs each told me on more than one occasion that provided sufficient amounts

were present to cover minimum branch expenses, the account could be used by the branch manager owner of the account for any purpose whatsoever...."); Pls.' Response to Defs.' Statement of Undisputed Material Facts ¶¶ 182, 184. The accumulated profits for Gelow's branch appear to have been treated slightly differently than the others, as they were used for his salary as well as the operating expenses of another branch. Plaintiffs do not dispute that Gelow was aware of this. Pls.' Response to Defs. Statement of Undisputed Fact ¶ 101.

the branch manager.[5] Decl. of Mark Gelow In Support of Pls.' Opp'n to Defs.' Mot. for Summ. J. ("Gelow Decl.") ¶¶ 4, 6; Decl. of Bruce Trout In Support of Pls.' Opp'n to Defs.' Mot. for Summ. J. ("Trout Decl.") ¶ 4; Decl. of Erik Fridley In Support of Pls.' Opp'n to Defs.' Mot. for Summ. J. ("Fridley Decl.") ¶ 4; Decl. of Vici Gordon In Support of Pls.' Opp'n to Defs.' Mot. for Summ. J. ("Gordon Decl.") ¶ 4; Decl. of Stephen Herndon In Support of Pls.' Opp'n to Defs.' Mot. for Summ. J. ("Herndon Decl.") ¶ 4; Decl. of Jeff Just In Support of Pls.' Opp'n to Defs.' Mot. for Summ. J. ("Just Decl.") ¶ 4; Decl. of Jenny Mann In Support of Pls.' Opp'n to Defs.' Mot. for Summ. J. ("Mann Decl.") ¶ 4; Decl. of Stephen Meier In Support of Pls.' Opp' n to Defs.' Mot. for Summ. J. ("Meier Decl.") ¶ 4; Decl. of Art Sierra In Support of Pls.' Opp'n to Defs.' Mot. for Summ. J. ("Sierra Decl.") ¶ 4; Decl. of Jase Stefanski In Support of Pls.' Opp'n to Defs.' Mot. for Summ. J. ("Stefanski Decl.") ¶ 4; Decl. of Gayle Pederson In Support of Pls.' Opp'n to Defs.' Mot. for Summ. J. ("Pederson Decl.") ¶ 4; Decl. of Mark Van Brussel In Support of Defs.' Mot. for Summ. J. ("Van Brussel Decl.") Ex. J (Herndon Depo. at 39:18–40:11). Plaintiffs also contend that CPM's written policies suggested that each branch's net profits were held in a separate account. Gelow Decl. ¶ 17, Ex. 3.

It is undisputed that the branch managers' salaries were subject to normal state and federal tax withholdings and deductions and that the branch managers only reported as salary those amounts that they actually drew down from the branch's net profits. When the funds were reported as salary, they would be subject to income tax and thus the managers preferred not to draw down more than they needed. At the end of the year, any net profits the branch retained that had not been drawn as the branch manager's salary would be rolled over to the next year. Defendants have tendered evidence that none of the CPM staff ever said anything to induce the branch managers to leave large balances in the branch accounts. Van Brussel Decl. Ex. E (Gelow Depo. at 51:21–24, 54:11–14, 59:25–60:3), Ex. I (Trout Depo. at 36:5–8). Plaintiffs do not materially dispute this. *See* Pls.' Response to Defs.' Undisputed Material Facts ¶ 91. It is further undisputed that more than once CPM staff encouraged Gelow to drawn from the account, taking the funds as bonuses. Van Brussel Decl. Ex. E (Gelow Depo. at 42:15–25, 54:4–8, 101:22–25), Ex. F (Courson Depo. at 20:19–25, 26:3–27:3), Ex. G (Cassell Depo. at 26:21–27:3); Pls.' Response to Defs.' Statement of Undisputed Facts ¶ 92.

Defendants have tendered evidence that Courson, Cassell, and Fuchs did not manage, maintain, or keep segregated branch manager accounts or made representations to this effect to the branch managers, except that Fuchs monitored the branch account balances to the extent that they showed as liabilities on CPM's general ledger. Courson Decl. ¶¶ 6, 8, 10; Fuchs Decl. ¶¶ 4–7; Cassell Decl. ¶¶ 4–7; Van Brussel Decl Ex. H (Fuchs Depo. at 40:17–24, 58:9–12); Gelow Depo. at 62:19–63:3–18. Although plaintiffs state that they dispute this, the only evidence they have tendered is Gelow's declaration that these defendants made representations to him about the financial health of CPM and instructed him that the branch manager accounts were to be used by the branch manager for any purpose. *See* Pls.' Response to Defs.' Statement of Undisputed

---

**5.** In his deposition, Gelow testified that he could not recall who said this or when. Decl. of Mark Van Brussel In Support of Defs.' Mot. for Summ. J. ("Van Brussel Decl.") Ex. E (Gelow Depo. at 65:18–66:3).

Material Facts ¶¶ 111–113, 125 (citing Gelow Decl. ¶¶ 4–6, 14). There is no dispute that none of the individual defendants ever told the plaintiffs that their branch accounts were employee benefits plans or retirement plans. *See* Defs.' Statement of Undisputed Material Facts ¶ 117; Gelow Depo. 90:16–91:6; Herndon Depo. 80:25–81:12; *see also* Pls.' Response to Defs.' Statement of Undisputed Material Facts ¶ 193 (undisputed that plaintiff Herndon never understood the branch account to be a retirement vehicle); Van Brussel Decl. Ex. I (testimony of plaintiff Trout that none of the individual defendants ever told him that the branch profits could be used for his retirement). Although Gelow testified that Courson's predecessor told him that the account could be used "for a rainy day," Courson never made a similar statement to him. *See* Pls.' Response to Defs.' Statement of Undisputed Material Facts ¶¶ 154–55. Moreover, it is undisputed that none of the individual defendants told the branch managers that they would have access to the funds after the termination of their employment.

It is undisputed that CPM staff never told plaintiffs Herndon or Trout that the money in the branch accounts was unreachable by CPM's creditors. *See* Pls.' Response to Defs.' Statement of Undisputed Material Facts ¶¶ 188, 249; *see also* Declaration of Stephen Herndon in Support of Pls.' Opp'n to Defs.' Mot. for Summ. J. ("Herndon Decl.") ¶ 5.

**6.** The parties dispute the exact date.

**7.** It is undisputed that defendant Fuchs did not make statements to the plaintiffs concerning the financial health of CPM. Gelow Decl. ¶ 15; Trout Decl. ¶ 12; Fridley Decl. ¶ 12; Gordon Decl. ¶ 11 Herndon Decl. ¶ 12; Just Decl. ¶ 10; Mann Decl. ¶ 11; Meier Decl. ¶ 11; Sierra Decl. ¶ 12; Stefanski Decl. ¶ 12; Pederson Decl. ¶ 14; *see also* Pls.' Response

### B. CPM's Closure

CPM began experiencing financial difficulties in mid–2006. Later that year, they began negotiations to sell CPM to another company, which was communicated to all CPM employees including through conference calls with and written communications to branch managers by defendant Courson. In January or February 2007,[6] Courson sent a letter to all branch managers advising that CPM had reached its limit of credit for mortgage loans but that it was endeavoring "to return to business as usual." Defs.' Statement of Undisputed Material Fact ¶ 70. Plaintiffs have declared that Courson repeatedly represented during this time that CPM was in good financial health and did not need to be purchased by another company in order to remain open.[7] *See, e.g,* Gelow Decl. ¶¶ 11, 15; Herndon Decl. ¶¶ 12–14. Plaintiffs Mann and Sierra have declared that defendant Cassell also made similar statements. Mann Decl. ¶ 11 Sierra Decl. ¶ 12. At the end of February 2007, however, the potential buyer backed out of the purchase. Defendants contend that this occurred because some of CPMS's wholesale branches had recently been recruited away by other companies. *Id.* ¶¶ 73–74. On February 26, 2007, CPM closed.

When it closed CPM owed its lenders and defaulted on these loans. It used the assets it had to pay certain bills, taxes, and 401(k) obligations. According to CPM's accountants, based on the assets it held, at no time prior to CPM's closure did it appear that CPM would not be able to meet its financial obligations.[8] *Id.* ¶¶ 82–83.

to Defs.' Statement of Undisputed Material Facts ¶¶ 210, 218. It is also undisputed that no branch manager ever asked Cassell if the money in the branch accounts was safe or whether CPM was having financial problems. *See* Pls.' Response to Defs.' Statement of Undisputed Material Facts ¶ 208.

**8.** Plaintiffs dispute this, but have tendered no evidence in support of their assertion.

CPM's accountant and auditor, Robert Boliard, testified that it only became apparent approximately a week before CPM closed that it did not have sufficient assets to cover its obligations. Van Brussel Decl. Ex. L (Boliard Depo. at 55:23–56:24); *see also* Pls' Response to Defs.' Statement of Undisputed Material Facts ¶ 209 (plaintiffs do not materially dispute that prior to CPM's closure, defendant Cassell did not believe the company was in danger of closing). According to Boliard, the primary reason for CPM's financial trouble was buy-back demands from investors to whom CPM had sold the loans and it became clear that "something was going wrong for CPM" when the potential buyer backed out of its "commitment to buy Central Pacific." *Id.* at 52:6–20, 56:13–24.[9]

There is evidence that Fuchs had a conversation with plaintiff Pederson, who called him to express concern about CPM's financial health and her branch's account balance in January 2007. He told her that the company was having financial difficulties but would survive and that if she was concerned about her branch's balance she could draw down the funds from it. Fuchs Depo. at 37:1:17; Pederson Decl. ¶¶ 6–9. According to Fuchs, this was the only conversation he had with any of the plaintiffs about their financial health of CPM during its last year. Fuchs Depo. at 36:8–22, 60:11–18. Plaintiff Gelow has declared that Fuchs told him on more than one occasion that the branch account funds were his to use as he liked. Gelow Decl. ¶ 5.

Plaintiffs Gelow, Herndon, and Trout, in their deposition testified that they had no knowledge of defendants Cassell or Courson having taken any money from Gelow's branch account for his personal use.

Defs.' Statement of Undisputed Material Facts ¶¶ 107, 158, 203, 204, 241. Although plaintiffs now state that they dispute this, they have tendered no material evidence in support of that. *See* Pls.' Response to Defs.' Statement of Undisputed Material Facts ¶¶ 107, 158, 203, 204, 241.

## II. SUMMARY JUDGMENT STANDARDS UNDER FEDERAL RULE OF CIVIL PROCEDURE 56

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Sicor Ltd. v. Cetus Corp.,* 51 F.3d 848, 853 (9th Cir.1995).

> Under summary judgment practice, the moving party [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' " *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish

9. Plaintiffs dispute this only with the declaration of Mark Gelow, in which he stated that Cassell and Fuchs knew the company was not in good financial health beginning in 2006, but has provided no foundation for this conclusory assertion. *See* Gelow Decl. ¶ 15. Accordingly the court sustains defendants' objection to this portion of the declaration.

the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See id.* at 322, 106 S.Ct. 2548. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323, 106 S.Ct. 2548.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Sicor Ltd.*, 51 F.3d at 853.

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed.R.Civ.P. 56(e); *Matsushita*, 475 U.S. at 586 n. 11, 106 S.Ct. 1348; *see also First Nat'l Bank*, 391 U.S. at 289, 88 S.Ct. 1575; *Rand v. Rowland*, 154 F.3d 952, 954 (9th Cir.1998). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Owens v. Local No. 169, Ass'n of Western Pulp and Paper Workers*, 971 F.2d 347, 355 (9th Cir.1992) (quoting *T.W. Elec. Serv., Inc. v. Pacific Elec.Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987)), and that the dispute is

genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505; *see also Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1228 (9th Cir.2000).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); *see also In re Citric Acid Litigation*, 191 F.3d 1090, 1093 (9th Cir.1999). The evidence of the opposing party is to be believed, *see Anderson*, 477 U.S. at 255, 106 S.Ct. 2505, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, *see Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (*per curiam* )); *see also Headwaters Forest Def. v. County of Humboldt*, 211 F.3d 1121, 1132 (9th Cir. 2000). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F.Supp. 1224, 1244–45 (E.D.Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).

## III. ANALYSIS

Defendants Courson, Cassell and Fuchs move for summary judgment on all of plaintiffs' causes of action: claim for benefits and breach of fiduciary duty under ERISA, violation of RICO, fraud, conversion, and breach of fiduciary duties. The court considers each in turn.

## A. Claim For Benefits and Breach of Fiduciary Duty Under ERISA

In their first cause of action, plaintiffs allege that the branch accounts were seg-

regated accounts that constituted employee benefit plans under ERISA that could be used for sickness and disability pay and retirement payments. They allege that defendants improperly diverted and embezzled funds from these accounts, breaching their fiduciary duties to plaintiffs.

■ ERISA defines "employee welfare benefit plan" as any benefits plan established for one of many purposes, including surgical, medical, hospital, accident and sickness benefits; vacation pay; and death, unemployment, or long-term disability benefits. 29 U.S.C. § 1002(1). ERISA further defines "employee pension benefit plan" as any plan providing retirement benefits or termination pay. 29 U.S.C. § 1002(2)(A)(i), (ii). Whether an ERISA plan exists is a question of fact, decided from the view of the reasonable person in consideration of all of the facts and circumstances. *See Kanne v. Conn. Gen. Life Ins. Co.*, 867 F.2d 489, 492 (9th Cir.1988).

■ As the court explained in its order resolving defendants' motion to dismiss, ERISA's preemptive provision is deliberately broad as a means to bring exclusively within federal control the regulation of pension and welfare plans. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45–46, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). To qualify as an employee benefits plan, the accounts at issue must demonstrate an ongoing administrative structure and allow reasonable persons to identify and distinguish the plan's beneficiaries, intended benefits, funding source, and the procedures beneficiaries utilize to receive benefits. *Winterrowd v. Am. Gen. Annuity Ins. Co.*, 321 F.3d 933, 938–39 (9th Cir. 2003).

■ While this is typically not a difficult standard to meet, there must be a plan, not simply an extension of benefits to the employee; and the plan must have terms from which a reasonable person could discern the basic elements of the benefits plan. *Id.* at 939. As the Supreme Court has explained, a mere provision of one of the benefits listed in the ERISA statute does not, by itself, bring that provision under ERISA. *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 7–8, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). Instead, there must be a plan. *Id.* at 8, 107 S.Ct. 2211 ("Nothing in our case law ... supports appellant's position that the word 'plan' should be read out of the statute.... Given the basic difference between a 'benefit' and a 'plan,' Congress's choice of language is significant in its pre-emption of only the latter.").

■ Moreover, ERISA does not regulate wage compensation and courts may not extend ERISA's protections to employees' salaries, as doing so would disrupt other federal and state statutory schemes. *Cal. Hosp. Ass'n v. Henning*, 770 F.2d 856, 861 (9th Cir.1985). Similarly, the sections of ERISA governing pension plans are limited to retirement income only, not current income. *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 575 (5th Cir.1980).

■ Here, the undisputed facts demonstrate that a factfinder could not reasonably conclude that the accounts of the CPM branches' net profits are "employee welfare benefit plans" or "employee pension benefit plans." According to plaintiffs, there was no plan, even impliedly, that the profits represented in these accounts were disbursed to managers for the particular purpose of providing health, disability, or vacation payments or retirement funds. The funds were undisputedly used for salaries and the only evidence tendered regarding defendants' statements for use of the funds establishes that defendants encouraged plaintiffs to use the surplus for bonuses. *See* Van Brussel Decl. Ex. E (Gelow Depo. at 42:15–25, 54:4–8, 101:22–25), Ex. F (Courson Depo. at 20:19–25,

26:3–27:3), Ex. G (Cassell Depo. at 26:21–27:3); Pls.' Response to Defs.' Statement of Undisputed Facts ¶ 92. Moreover, there are no terms for these accounts, from which a the structure of a plan could be discerned by a reasonable person. Instead, the funds could be drawn at any time for any purpose. The mere fact that the funds may have been segregated for plaintiffs' exclusive use, as plaintiffs contend, does not alone indicate that those funds existed as part of an employee benefit plan.

Simply put, ERISA regulates employee benefit plans and, in order to prove that ERISA governs their claims, plaintiffs must make at least a minimal showing that a plan existed. *Fort Halifax Packing Co., Inc.*, 482 U.S. at 7–8, 107 S.Ct. 2211; *Winterrowd*, 321 F.3d at 938–39. Here, that showing has not been made. Defendants' motion is granted on plaintiffs' first cause of action.

## B. Fraud

Plaintiffs allege that defendants made false representations to them on which plaintiffs relied. In their opposition to defendants' motion, plaintiffs specify that these included statements that the branch accounts were segregated for plaintiffs' benefit and statements regarding the financial health of CPM.

█ In order to succeed on a claim for fraud, the plaintiff must show "(a) misrepresentation (false representation, concealment or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damages." *Agosta v. Astor*, 120 Cal.App.4th 596, 603, 15 Cal. Rptr.3d 565 (2004).

### 1. Allegations Regarding the Nature of the Branch Accounts

█ Regarding the allegations that defendants fraudulently misrepresented that the branch accounts were segregated and secured for the branch managers' exclusive benefits, plaintiffs Herndon, Gordon, Just, and Sierra have tendered evidence sufficient to defeat defendants' motion on the first element of this cause of action. Plaintiff Herndon declared that defendant Courson represented to him that the money in the branch manager's account was his alone and no one would touch the money in the account without his permission.[10] Herndon Decl. ¶ 5. Plaintiff Gordon declared that defendants Cassell, Courson, and Fuchs made the same representations to her at a meeting in January 2006. Gordon Decl. ¶ 5. Plaintiff Just has declared that defendants Fuchs, Courson, and Cassell made similar statements to him in the years before CPM closed. Just Decl. ¶¶ 4, 12. Plaintiff Sierra declared that Courson and Cassell similarly told him that the money in the branch manager account was "safe and would be kept available for" him. Sierra Decl. ¶ 6.

As to the remaining plaintiffs, however, there is no evidence that any of the individual defendants made statements to any of the plaintiffs that the accounts of the branches' net profits belonged to the branch managers, were segregated from other CPM funds, or could not be reached by CPM creditors. Instead, most of the plaintiffs' declarations do not identify who made these statements to them or identify persons other than the individual defendants as being the person who made these representations.[11] Trout Decl. ¶ 4; Stefanski Decl. ¶¶ 4–5; Pederson Decl. ¶¶ 4–5;

---

**10.** Despite defendants' argument otherwise, Herndon did not contradict this in his deposition testimony. *See* Herndon Depo. at 78:2–79:11.

**11.** Plaintiffs have not tendered any evidence that third parties, making such declarations, were the agents of Courson, Cassell, or Fuchs.

Mann Decl. ¶¶ 4, 10; Herndon Decl. ¶¶ 4; Fridley Decl. ¶¶ 4–5; Meier Decl. ¶ 4. The only evidence of representations made by the individual defendants to these plaintiffs about the nature of these accounts was that they could be used by the branch managers for any purpose. Gelow Decl. ¶ 5; Pederson Decl. ¶ 5.

Plaintiffs purport to rely on the CPM Finance and Administration Manual for their argument that defendants made these representations, but the document does not support them. *See* Gelow Decl. ¶ 17, Ex. 3. Instead, the relevant portion, cited in part by plaintiffs, provides that all checks received by a branch "will be deposited into the Company's general bank account and credited to your branch's income account...." *Id.* at 2.1. This refutes, rather than supports, plaintiffs' contention that the defendants even indirectly represented to them that the net profits generated at each branch were held in separate accounts for the branch managers. Although plaintiffs may have inferred from this that "the money in the branch manager accounts was real money and belonged to the branch managers," Pederson Decl. ¶ 16, they have not tendered evidence that this was ever represented to them by Courson, Cassell, or Fuchs.

Therefore, as to the alleged representations made regarding whether the branch manager accounts were segregated for the branch manager's exclusive use, only plaintiffs Herndon, Gordon, Just, and Sierra have tendered evidence that if credited would permit a factfinder to find that they had established the first element of the fraud claim.

■ Turning to the second element of the cause of action, knowledge of falsity, and the third element, intent, these may be inferred by the circumstances. *See Las Palmas Assoc. v. Las Ctr. Assoc.*, 235 Cal. App.3d 1220, 1239, 1 Cal.Rptr.2d 301 (1991); *Continental Airlines, Inc. v.*

*McDonnell Douglas Corp.*, 216 Cal.App.3d 388, 428, 264 Cal.Rptr. 779 (1989). Here, plaintiffs have presented circumstantial evidence that, if credited, would establish defendants' knowledge of the falsity of their statements and their intent. The individual defendants were the senior management of CPM and one could reasonably infer knew and understood the nature of branch accounts, including whether the funds therein were under the exclusive control of branch managers. Further, given CPM's negotiations for a buyer in 2006, a factfinder could reasonably infer that the defendants did not desire that the branch managers draw out all of the funds from these accounts, so that CPM would appear to have greater assets in the sales negotiation. From this, a factfinder could conclude that the individual defendants knowingly and intentionally misrepresented to plaintiffs Herndon, Gordon, Just, and Sierra that the funds in the branch accounts were secure and under their exclusive control.

Next, defendants must show that no reasonable factfinder could conclude that the plaintiffs justifiably relied on these representations. Defendants first contest that plaintiffs Herndon, Gordon, Just, or Sierra actually relied on statements made concerning the segregated nature of the accounts. It is undisputed that the branch managers did not pay taxes on the amounts in the accounts until they drew them as salaries. *See* Pls.' Response to Defs.' Statement of Undisputed Facts ¶¶ 29–32. For this reason, defendants argue, plaintiffs did not actually treat the money as their own but as CPM's until funds were drawn down. Nevertheless, a factfinder could reasonably conclude that the plaintiffs chose not to draw down the funds as salary, thus incurring tax liability, precisely because they believed the funds in the branch account would always be available to them.

Defendants further argue that plaintiffs' reliance was not justifiable. The reasonableness of a plaintiff's reliance on false statements made by the defendant is typically a question of fact, informed by the plaintiff's knowledge, education, and experience. *Guido v. Koopman,* 1 Cal.App.4th 837, 843–44, 2 Cal.Rptr.2d 437 (1991). Here, defendants argue that no one with plaintiffs' education and experience could have justifiably believed that the branch accounts were separated, protected accounts, beyond the reach of CPM management or creditors. They have tendered evidence that plaintiff Herndon had a college degree, a real estate license and management experience. Defs.' Statement of Undisputed Facts ¶¶ 17, 168–74. They have not tendered any evidence, however, that Herndon had prior experience with the branch account arrangement employed by CPM or that it was otherwise typical in the industry. Nor have defendants directed the court to any evidence of plaintiffs' Gordon, Just, and Sierra's experience or education. Accordingly, the court cannot conclude that no reasonable factfinder could find that Herndon, Gordon, Just, and Sierra were not justified in relying on defendants' statements characterizing the branch accounts.

Finally, plaintiffs have tendered sufficient evidence to defeat defendants' motion on the final element of the fraud claim, that they suffered damages. Each has declared that there was a certain sum in his or her branch account and he or she chose not to draw it as salary prior to CPM's closure because of the belief that the funds were secure. Herndon Decl. ¶¶ 8, 11; Gordon Decl. ¶¶ 8, 11; Just Decl. ¶¶ 6, 9; Sierra Decl. ¶¶ 8, 11. This suffices to defeat defendants' motion as to this cause of action.

### 2. Allegations Regarding the Financial Health of CPM

■ With regards to the allegations that the individual defendants made misrepresentations about the financial health of CPM, none of the plaintiffs have tendered any evidence from which a factfinder could find that they had established the first or second elements of a fraud cause of action.

There is evidence that each of the individual defendants made statements that CPM was in good financial health and would not close. *See, e.g.,* Just Decl. ¶ 10 (statements of Courson); Sierra Decl. ¶ 12 (statements of Courson and Cassell); Pederson Decl. ¶ 6 (statements of Fuchs). However, plaintiffs have tendered no evidence that these statements were false or, if they were, that defendants knew of their falsity. The only evidence plaintiffs have tendered is the opinion of plaintiff Gelow that "[b]y the nature of their positions and inside information, Cassell and Fuchs were fundamentally aware of the falsity of [Courson's] statements [professing the financial health of CPM] . . . ." Gelow Decl. ¶ 15. Plaintiff's unfounded opinion that the defendants knew of the falsity of the statements, of course, does not suffice as evidence of a genuine dispute. *See Richards,* 602 F.Supp. at 1244–45.

In contrast, the evidence of defendants is that it was not until a week before CPM's closure that its accountant believed it would close. *See* Van Brussel Decl. Ex. L (Boliard Depo. at 55:23–56:24). Plaintiffs, in their response to defendants' statement of undisputed facts, argue that defendants' 2004 and 2006 balance sheets demonstrate that CPM could not meet its financial obligations. *See* Pls.' Response to Defs.' Separate Statement of Undisputed Facts ¶ 84. This interpretation is hardly self-evident in the 2006 balance sheet.[12]

---

12. A 2004 balance sheet has not been tendered.

*See* Declaration of Shane Reich In Support of Defs.' Mot. for Summ. J. Ex. 5. More importantly, there is no evidence that the individual defendants had reason to disbelieve their accountant's depiction of the financial health of CPM, derived either from the balance sheets or otherwise. Simply put, there appears to be no evidence from which a jury could reasonably conclude that plaintiffs established the first or second elements of their cause of action for fraud based on statements the individual defendants made concerning the financial health of CPM.

Accordingly, defendants' motion is denied as to plaintiffs Herndon, Gordon, Just, and Sierra's third cause of action, to the extent that it is based on allegations regarding statements the individual defendants made describing the security and exclusive use of the branch accounts. It is granted as to the other plaintiffs and on all other grounds for this cause of action.

### C. Conversion

In their fourth cause of action, plaintiffs allege that defendants committed the tort of conversion by appropriating the funds in the branch accounts. They allege that all or some of the defendants received this converted property.

■■■■ Conversion is the "wrongful exercise of dominion over the property of another." *Spates v. Dameron Hosp. Ass'n,* 114 Cal.App.4th 208, 221, 7 Cal. Rptr.3d 597 (2003) (internal citations omitted). In order to prevail on a claim for conversion, a plaintiff must prove that (1) the plaintiff had ownership or a right to possession of property at the time of the conversion, (2) the defendant converted this property through its wrongful act or disposition of the property rights, and (3) that plaintiff suffered damages. *Id.*

Here, defendants move for summary judgment on the grounds that there was no fixed sum of money that was allegedly converted, that defendants committed no wrongful act, and that this cause of action is preempted by the remedies of the California Labor Code. The court considers each in turn.

### 1. Whether There Was A Specific, Identifiable Sum

■■■■ A generalized claim for money is not actionable as conversion. *Vu v. Cal. Commerce Club,* 58 Cal.App.4th 229, 235, 68 Cal.Rptr.2d 31 (1997); *see also Farmers Ins. Exch. v. Zerin,* 53 Cal.App.4th 445, 452, 61 Cal.Rptr.2d 707 (1997) ("a mere contractual right of payment, without more, will not suffice"); *accord In re Bailey,* 197 F.3d 997, 1000 (9th Cir.1999). If, however, "there is a specific, identifiable sum involved, such as where an agent accepts a sum of money to be paid to another and fails to make the payment," a cause of action for conversion exists. *McKell v. Wash. Mut., Inc.,* 142 Cal.App.4th 1457, 1491, 49 Cal.Rptr.3d 227 (2006); *see also Fischer v. Machado,* 50 Cal.App.4th 1069, 1072–73, 58 Cal.Rptr.2d 213 (1996). In other words, "money can only be treated as specific property subject to being converted when it is 'identified as a specific thing.'" *PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil, & Shapiro, LLP,* 150 Cal.App.4th 384, 395, 58 Cal. Rptr.3d 516 (2007) (quoting *Baxter v. King,* 81 Cal.App. 192, 194, 253 P. 172 (1927)). That said, it is not necessary that "each coin or bill be earmarked." *Haigler v. Donnelly,* 18 Cal.2d 674, 681, 117 P.2d 331 (1941).

■■■■ Here, defendants argue that there was no specific sum because there was no literal setting aside of funds for the branch managers. According to defendants, each branch did not have a separate account but rather the "branch accounts" simply represented credits to each branch, while the actual funds were kept in a CPM general

account. Plaintiffs don't dispute this contention. Defendants further argue that these sums were not certain but would fluctuate over time, which plaintiffs do not materially dispute.

Defendants' position is not consistent with the California courts' holdings on this issue. The facts here are similar to those of *Fischer,* 50 Cal.App.4th 1069, 58 Cal. Rptr.2d 213. In *Fischer,* plaintiffs were farmers and defendant was their sales agent. 50 Cal.App.4th at 1071, 58 Cal. Rptr.2d 213. Defendant sold plaintiffs' products for them and placed the proceeds in its general operating account, using it to pay salaries and other business expenses. *Id.* Thereafter, the defendant went bankrupt and never paid plaintiffs the proceeds from the crop sale. *Id.*

The court held that this gave rise to an action for conversion, rejecting defendant's argument that plaintiffs "were not entitled to exercise dominion and control over any specific funds." *Id.* at 1072, 58 Cal. Rptr.2d 213. The dispositive fact was not whether the funds were actually segregated, but whether there was an identifiable amount to which plaintiffs were legally entitled. *Id.* at 1073–74, 58 Cal.Rptr.2d 213; *see also Weiss v. Marcus,* 51 Cal. App.3d 590, 599, 124 Cal.Rptr. 297 (1975); *McCafferty v. Gilbank,* 249 Cal.App.2d 569, 571, 57 Cal.Rptr. 695 (1967). As this court has explained elsewhere, "[i]t is immaterial whether the funds at issue were in fact segregated; otherwise, defendants could shield themselves from liability by simply commingling funds." *Gulf Ins. v. First Bank,* No. S–08–209–LKK/JFM, 2008 WL 2383927 at *3 n. 4 (E.D.Cal. June 4, 2008).

Defendants argument that the amount in the branch accounts was not certain because it fluctuated is similarly unavailing. It is undisputed that the branch accounts contained the net profits from loans originating in that branch. Although the dollar amounts of the accounts would fluctuate as profits were added and expenses, including salaries, were withdrawn, the sums were always ascertainable. In that sense, it seems that the branch accounts fluctuated in the same manner that, for example, an interest-bearing savings account fluctuates: although the dollar amount contained in the account may change daily as interest is compounded, the sum is always ascertainable. *See, e.g., PCO,* 150 Cal.App.4th at 396, 58 Cal. Rptr.3d 516 (collecting cases and observing that "[i]n each of these cases [where an action for conversion was upheld], the amount of money converted was readily ascertainable").

 It appears that plaintiffs' claim fails, however, on the second element, that defendants converted the property through a wrongful act. In order to establish this element, the plaintiff must show "an assumption of control or ownership over the property, or that the alleged converter has applied the property for his own use." *Shopoff & Cavallo LLP v. Hyon,* 167 Cal.App.4th 1489, 1507, 85 Cal.Rptr.3d 268 (2008).

 Here, plaintiffs have not materially disputed that they have no knowledge or evidence that the Cassell, Courson, or Fuchs took any of the funds in the branch accounts.[13] *See* Pls.' Response to Defs.' Separate Statement of Undisputed Facts ¶¶ 107, 158–160, 203–204, 214, 240–241. It

---

**13.** Plaintiffs have tendered evidence in the form of Gelow's declaration purporting to dispute this, but the cited evidence does not indicate that any of the individual defendants took funds from the branch accounts. *See*

Pls.' Response to Defs.' Separate Statement of Undisputed Facts ¶¶ 158–160 (citing Gelow Decl. ¶¶ 4–6, 10, 11, 14, 15), ¶¶ 203–204 (citing Herndon Depo. at 75:12–77:22); ¶ 241 (citing Trout Decl. ¶¶ 12–14).

is also undisputed that the individual defendants only received their salaries from CPM and that they received their last paychecks in the first half of February 2007, prior to CPM's closure. *See* Pls.' Response to Defs.' Separate Statement of Undisputed Facts ¶¶ 81, 129, 131–134, 252. Although plaintiffs argue in their opposition to defendants' motion that the individual defendants used the funds in the branch accounts for their own salaries prior to CPM's closure, they have tendered no evidence of this at all. Plaintiffs have simply tendered no evidence that the individual defendants, rather than CPM (who is also named as a defendant), appropriated funds from the branch accounts. For this reason, defendants' motion is granted as to this cause of action.[14]

### D. Breach of Fiduciary Duty

In their fifth cause of action, plaintiffs allege that defendants "undertook fiduciary duties to plaintiffs due to their positions within Ivanhoe and Central Pacific and due to their representations as alleged...." First Amended Compl. ¶ 49. According to plaintiffs, defendants breached this duty for their own benefit. In their opposition to plaintiffs' motion, they clarify that defendants assumed fiduciary duties by maintaining the branch accounts for plaintiffs and breached that duty by misleading plaintiffs "as to the branch accounts." Pls.' Opp'n to Defs.' Mot. for Summ. J. at 10.

 Whether a fiduciary relationship exists is a question of law. *David*

*Welch Co. v. Erskine & Tulley*, 203 Cal. App.3d 884, 890, 250 Cal.Rptr. 339 (1988). The burden lies with the plaintiff to show that a fiduciary relationship existed. *La-Monte v. Sanwa Bank Cal.*, 45 Cal.App.4th 509, 517, 52 Cal.Rptr.2d 861 (1996). In *LaMonte*, the court found that plaintiff had not met this burden in its claim that defendant was a fiduciary because it was a custodian of an account, because "[t]here was no evidence ... that [defendant] had either expressly or by implication agreed to supervise or monitor the finances and accounts of [plaintiff]." *Id.* at 517–18, 52 Cal.Rptr.2d 861. Moreover, in cases where defendant is alleged to be a custodian of plaintiff's account, the defendants' fiduciary duties only extend to the scope of its agency, as defined by the agency agreement between the parties. *Id.* at 517, 52 Cal.Rptr.2d 861 (citing *Van de Kamp v. Bank of America*, 204 Cal.App.3d 819, 860, 251 Cal.Rptr. 530 (1988)).

 Here, plaintiffs have tendered no evidence from which it could be concluded that a fiduciary relationship existed between plaintiffs and the individual defendants regarding the branch manager accounts. Plaintiffs' own evidence establishes that it was CPM, not the individual defendants, that maintained the accounts and provided accounting services for them. Gelow Decl. Ex. 3. There is no evidence that the individual defendants managed the accounts or otherwise assumed any fiduciary responsibilities to plaintiffs for their maintenance. Because

---

**14.** The court is not persuaded, however, that plaintiffs' claim is barred because an exclusive remedy exists in the Labor Code. Although a plaintiff cannot bring an action for conversion on an alleged violation of the Labor Code, *Grodensky v. Artichoke Joe's Casino*, 91 Cal.Rptr.3d 732, 775 (2009), *review granted* 211 P.3d 1061 (2009), here plaintiffs' conversion claim is not premised on the Labor Code either expressly or necessarily. Although de-

fendants contend that plaintiffs' claim seeks unpaid wages, it is undisputed that the branch accounts were not only to be used as wages, but "for any purpose whatsoever." Gelow Decl. ¶ 5. It is therefore not apparent that the funds would fall under the provisions of the Labor Code governing wages, Cal. Labor Code § 204, or any other section of the code.

the scope of a fiduciary's duties is strictly defined, *see Van de Kamp,* 204 Cal. App.3d at 860, 251 Cal.Rptr. 530, the statements defendants may have made concerning the nature of the accounts and advice to plaintiffs to draw funds from them did not generate a fiduciary relationship between the parties as to the general management and accounting of the accounts, if at all.

Because plaintiffs have failed to meet their burden to demonstrate the existence of a fiduciary relationship between the parties, defendants' motion is granted on this cause of action.

## E. Violation of RICO

In their second cause of action, plaintiffs allege that defendants violated the RICO statute, 18 U.S.C. § 1962, so as to give rise to civil liability. Plaintiffs allege that defendants engaged in a scheme to defraud plaintiffs and embezzle funds from the branch accounts.

 18 U.S.C. § 1962 provides the basis for civil liability under RICO.[15] *Turner v. Cook,* 362 F.3d 1219, 1228 (9th Cir.2004). Section 1962(a) imposes liability for the use or investment in foreign or interstate commerce of income derived from a pattern of racketeering activity. 18 U.S.C. § 1962(a). An essential element of a cause of action under this subsection is that defendant used or invested the funds derived from racketeering activities, not simply that defendant obtained funds from plaintiff through those activities. *Nugget Hydroelectric, L.P. v. Pacific Gas & Elec. Co.,* 981 F.2d 429, 437 (9th Cir.1992). Defen-

dants have moved for summary judgment on the grounds that, to the extent that plaintiffs allege that defendants violated this subsection, there is no evidence that the individual defendants invested or used any of the funds they are alleged to have wrongfully obtained. Plaintiffs have offered no opposition to this, *see* Pls.' Opp'n to Defs.' Mot. for Summ. J. at 10–11, and therefore defendants' motion is granted on this ground.

Section 1962(c) imposes liability on a person employed by or associated with an enterprise that affects foreign or interstate commerce for conducting or participating in the affairs of the enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(c).

Here, plaintiffs argue that fraud, conversion, and embezzlement constituted the predicate acts for defendants' liability under RICO. However, they have tendered no evidence of embezzlement and, as discussed above, insufficient evidence of conversion. Therefore, the RICO cause of action may only lie based upon the evidence of fraud, described above. There is some evidence that the assertedly fraudulent communications occurred over the telephone, implicating wire fraud, which is one of predicate acts for which a RICO violation may be found.[16] 18 U.S.C. § 1961(1)(B); 18 U.S.C. § 1343; *see* Herndon Decl. ¶ 5 (Courson made statements over the telephone).

The Ninth Circuit has held that an "enterprise" under § 1962(c) may be an innocent enterprise or it may be a group of individuals who have combined for an ille-

---

**15.** Plaintiffs do not specifically allege what sections of 1962 Defendants violated. However, § 1962(b) pertains to the "collection of unlawful debt" and appears inapplicable to facts alleged in the complaint. 18 U.S.C. § 1962(b). In their opposition to defendants' motion, plaintiffs make no reference to § 1962(b).

**16.** In their motion, defendants presently do not challenge that there is evidence that they engaged in a scheme to defraud, as required under 18 U.S.C. § 1343. *See* Defs.' Mot. for Summ. J. at 29–30.

gal purpose. *United Energy Owners Comm., Inc. v. U.S. Energy Mgmt. Sys., Inc.,* 837 F.2d 356, 362 (9th Cir.1988); *see also United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) ("On its face, the definition [of enterprise] appears to include both legitimate and illegitimate enterprises within its scope. . . ."). The infiltrated enterprise may contain some of the plaintiffs. *United Energy Owners Comm., Inc.,* 837 F.2d at 362–63.

■ Defendants have not directed the court to any authority, let alone any in this circuit, for its assertion that acts of individual defendants employed by a corporation are treated as the corporation's acts for RICO purposes and, therefore, there can be no liability under § 1962(c) because the "person" and the "enterprise" would be a single entity. *See* Defs.' Mot. for Summ. J. at 31. This interpretation contradicts the plain language of the section, which provides that a person "employed by" an enterprise may be liable for racketeering acts committed through the enterprise. 18 U.S.C. § 1962(c). It is also contrary to the longstanding interpretation of the section as applying to misconduct by persons who have "infiltrated" an innocent enterprise. *See Turkette,* 452 U.S. at 591, 101 S.Ct. 2524; *United Energy Owners Comm., Inc.,* 837 F.2d at 362–63.

Defendants do not move for summary judgment on this cause of action on any other grounds and therefore the court makes no findings as to the additional elements of the cause of action. Because defendants have failed to show that there is no genuine dispute of material fact as to whether they could reasonably be found to have committed fraud and whether they were distinct from the enterprise at issue, the defendants' motion is denied on this cause of action to the extent that it is based on allegations of wire fraud.

## F. Availability of Punitive Damages

■ Finally, defendants move for summary judgment on the basis that plaintiffs have no evidence that would warrant an award of punitive damages. Under California law, a plaintiff may be awarded punitive damages upon proving by clear and convincing evidence that defendant acted with oppression, fraud, or malice in committing a tort. Cal. Civ.Code § 3294. There is no bar to awarding punitive damages for fraud when the underlying tort is fraud. *Miller v. Nat'l Amer. Life Ins.,* 54 Cal.App.3d 331, 336, 126 Cal.Rptr. 731 (1976); *Block v. Tobin,* 45 Cal.App.3d 214, 220, 119 Cal.Rptr. 288 (1975); *see also Alliance Mortgage Co. v. Rothwell,* 10 Cal.4th 1226, 1241, 44 Cal.Rptr.2d 352, 900 P.2d 601 (1995); *Wyatt v. Union Mortgage Co.,* 24 Cal.3d 773, 790, 157 Cal.Rptr. 392, 598 P.2d 45 (1979). Therefore, to the extent that plaintiffs Herndon, Gordon, Just, and Sierra have tendered adequate evidence to permit a jury to find in their favor on their fraud claim, a jury could also award punitive damages based on defendants' fraudulent conduct under § 3294.

## IV. CONCLUSION

For the reasons stated herein, defendants Courson, Cassell, and Fuchs' motion for summary judgment is GRANTED IN PART. It is DENIED as to plaintiffs' second and third causes of action and prayer for punitive damages, to the extent provided herein.

IT IS SO ORDERED.