Filed 4/25/23

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>[*]


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| KATHY POOL-O'CONNOR et al., | F083954 |
| Plaintiffs and Respondents, | (Super. Ct. No. BPB-19-002534) |
| v. | |
| CHRISTOPHER GUADARRAMA, as Trustee, etc., | **OPINION** |
| Defendant and Appellant. | |


APPEAL from an order of the Superior Court of Kern County.  Andrew B. Kendall, Commissioner.

Law Offices of Robert H. Brumfield and Robert H. Brumfield III for Defendant and Appellant.

Van Sciver Law and Kurt Van Sciver for Plaintiffs and Respondents.

-ooOoo-

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of sections I, II and V.

# INTRODUCTION

This case involves disputes over the disposition of assets of Albert R. Pool (Albert)[1] following his demise. The assets at issue include monies held in a joint checking account and real and personal property assets held in trust pursuant to the Albert R. Pool Family Revocable Trust (unnecessary capitalization omitted) ("Original Trust Instrument") as amended and restated in the 2013 Amendment and Restatement of the Albert R. Pool Family Revocable Trust (unnecessary capitalization omitted) ("Amended/Restated Trust" or "Trust"). Appellant Christopher Guadarrama (Christopher) was Albert's nephew, as well as his attorney-in-fact under a durable power of attorney (POA), executor under a pour-over will, and successor Trustee under the Amended/Restated Trust.

Christopher appeals from an order (the "subject order") of the superior court sitting in probate (the "probate court") entered on December 15, 2021, in connection with an Amended Petition to Surcharge Trustee for Breach of Trust; Petition to Determine Trust Ownership of Assets and for Damages Pursuant to Probate Code Section 859 (unnecessary capitalization omitted) brought by respondent Kathy Pool-O'Connor (Kathy) and joined in by respondents Rachelle Lapham (Rachelle) and Sharon Whiteside (Sharon), each of whom were beneficiaries under the Amended/Restated Trust.

We conclude the subject order should be modified to correct a transpositional error, and remand for that purpose. In all other respects, the order is affirmed.

---

[1] For purposes of clarity and convenience, we refer to the parties and various family members by their first names. No disrespect is intended.

2.

**PROCEDURAL AND FACTUAL BACKGROUND**

**I.      Factual Background**

**A.      *Select Family History***

Albert was a businessman and property owner in Lebec, California.  Albert and his wife, Mabeleen, owned various residences, vacant lots, and a mini-mart in Lebec.  Prior to her passing, Mabeleen was the primary operator of the mini-mart, and did the banking for her and her husband.  She predeceased Albert in 2002.

Albert and Mabeleen had four biological children, Kathy, Sharon, Diana Pool, and an older brother, Michael Pool.  Michael died before any of the events in question.  In addition, Albert adopted his granddaughter Rachelle who is Kathy's daughter.

Albert's wife, Mabeleen, had a sister, Maxine, and Christopher was Maxine's son.  After Mabeleen died, Sharon, Kathy, and Maxine operated the mini-mart.  Maxine took over managing finances for the mini-mart and for Albert.  When Maxine's health began to decline, a decision was made to close the mini-mart.

Starting in 2012, Christopher began helping Albert and Maxine manage the family finances and pay the family bills.  Christopher would make out the checks and either Albert or Maxine would sign them.  Maxine would also give Christopher signed blank checks for Christopher to fill out with payee and payment information.  Albert had only one bank account and it was jointly held by him and Maxine up until 2013 at which time Christopher was added as an authorized signer on the account (the "joint account").  From 2012 up to the date of Albert's passing, only Albert's money was ever deposited into the joint account.  Albert did little, if any banking himself.  He could not read well and secreted cash in various locations.[2]  His daughter Sharon described him as a "miser."

---

[2] For example, in the First Account and Report of Christopher Guadarrama, Trustee for Albert R. Pool Family Trust (bold type and unnecessary capitalization omitted), Christopher disclosed a total of $89,894.50 in cash and coins found in Albert's home, other real property he owned, automobiles and a recreational vehicle.

### B. Albert's Estate Planning Documents

Albert and Mabeleen created the Original Trust Instrument on December 6, 1992. (Albert and Mabeleen are sometimes referred to as the "Settlors" in connection with the Original Trust Instrument. Albert is sometimes referred to as the "Settlor" in connection with the Amended/Restated Trust.)

As mentioned, Mabeleen predeceased Albert in 2002. The Original Trust Instrument provided, in part: "Except as otherwise expressly provided …, on the death of the first Settlor, the designation of beneficiaries or specific gifts in the trusts created … shall become irrevocable and not subject to amendment or modification."

On February 28, 2013, Albert executed a series of estate planning documents. Specifically, and without limitation, Albert executed (1) the Amended/Restated Trust naming his nephew, Christopher, first successor Trustee of the Amended/Restated Trust, and Christopher's mother, Maxine, second successor Trustee in the event Christopher could not, or would not, serve; (2) a pour-over will in which Albert gifted his entire estate to the Trustee of his Trust and nominated Christopher to serve as executor of his will; and (3) the POA appointing Christopher as his attorney-in-fact.

In Exhibit A to the Amended/Restated Trust, Albert "transfer[red] and grant[ed] to the Trustees all of the property of the Settlor" including "all real property of the Settlor, and any interests therein …."; "[a]ll motor vehicles, boats, and trailers" owned by the Settlor; "[a]ll accounts, certificates of deposit, or other investments with any brokerage house or financial institution, in which the Settlor has any interest …"; and "[a]ll personal property of any nature …."

As to Trust assets not subject to a gift provision, the Amended/Restated Trust provided that Sharon, Kathy, Diana, Rachelle and Maxine (or their respective issue if they did not survive Albert) would each receive a 16.6% share of the total Trust property for a total cumulative percentage share of 83%. Barring certain circumstances and

4.

subject to other contingencies, the remaining 17% share was to be equally divided among a handful of individuals including Christopher.

### C. The Joint Account

On September 8, 2017, Albert added Christopher as an authorized signer to the joint account. Albert died a little over five months later on February 28, 2018. Christopher testified that, from the time the POA was signed up until Albert's death, all of his acts with respect to the joint account were taken in his capacity as attorney-in-fact.

Christopher testified Albert's mental capacity diminished a "[c]ouple of months before his death" in February 2018. When asked if Albert's mental capacity was diminishing as early as September or October of 2017, Christopher was unable to say. Rachelle was asked about Albert's mental state. She testified that his mind was slipping, he was forgetful, he would say off-the-wall stuff, and would suddenly go quiet mid-conversation. One of his eyes was practically closed. Beginning in 2017, he began to struggle, began falling, had hurt his lip and hit his head, and needed regular blood transfusions due to leukemia.

Christopher testified that during the period 2012 through 2015, the balance of the joint account was never much more than $7,800. After said period, several large deposits were made to the joint account. On March 11, 2016, at Albert's instruction and prior to Christopher being added as an authorized signer, Christopher deposited $59,516.24 into the account. The deposit consisted of proceeds from the sale of 2103 Lebec (the mini-mart property).

After Christopher was added to the joint account, Christopher caused two additional large deposits of Albert's money to be made into the account. Specifically, on October 23, 2017, Christopher deposited $99,720.46 of Albert's money into the account. On November 30, 2017, Christopher deposited another $104,922.07 of Albert's money into the account. Christopher was unable to testify as to the source of the funds for these two deposits. He had no recollection of making the deposits. When asked if Albert told

5.

him "anything about these funds when [Christopher] deposited them, he responded, "I don't remember specific deposits and amounts, so no."

Christopher testified he did not believe the money in the joint account had anything to do with the Trust. However, when Christopher loaned $25,000 from the joint account to his cousin, Albert Ratcliffe, in March 2018, he prepared an installment note for the loan and drafted the note so that it was made payable to the Trust. For several months thereafter, Christopher, in his capacity as Trustee, collected money on the note and deposited the money into a new Trust account he had set up. Christopher was asked, "Doesn't this indicate that in your mind at this time in March 2018 that you believed the money in that account was a [T]rust asset?" Christopher responded, "No." He testified he believed he was loaning Mr. Ratcliffe his own money. Christopher later explained at trial that he had previously loaned Mr. Ratcliffe money and had trouble getting it back. He thought Mr. Ratcliffe would be more likely to pay it back if he thought the Trust required repayment.

### 1. *Withdrawals From the Joint Account Following Albert's Death*

On or about April 28, 2018, Christopher wrote himself a check from the joint account in the amount of $200,000. The following month, on or about May 24, 2018, Christopher wrote himself another check from the joint account in the amount of $50,000, leaving an ending balance of $6,712.95 in the account.

Christopher was asked what Albert Pool told him about the joint account at the time he was added to the account as an authorized signer. Christopher responded, "When we left—well, prior to going there, nothing other than we were going there to add me to the account." He was subsequently asked, "On that day and after [Albert] and you signed this signature card, did [Albert] discuss anything with you about this account?" Christopher responded, "Yes." Christopher testified Albert said, "That when he was gone, it was mine to do with as I wanted." He was then asked, "did you have any further discussions after that time, after that day, as to this account and before he died?"

6.

Christopher responded, "No." He testified that, after that day, Albert never made any further comments about Christopher receiving the money in the joint account upon Albert's death.

Christopher was questioned further about his statement that Albert told him the joint account would be his to do with as he wanted once Albert passed away. Christopher was asked the following questions and gave the following answers:

Q. "Did [Albert] mean that you would receive the funds on behalf of the trust?"

A. "No."

Q. "Did he discuss the [T]rust with you in that conversation?"

A. "In that conversation, no."

Q. "Did he ever say, 'I'm leaving you this money in the account and the [T]rust is totally separate?"

A. "Yes."

Q. "When did he say that?"

A. "At a later date he instructed me where there was cash."

### 2. *Withdrawals From the Joint Account Prior to Albert's Death*

Christopher also made a number of withdrawals from the joint account prior to Albert's death. On numerous occasions Christopher withdrew monies from the joint account via ATMs in California and in Nevada. He also transferred money to his girlfriend via Western Union on numerous occasions. The probate court found that $42,059 was withdrawn by Christopher prior to Albert's passing. Under the POA, Christopher was authorized to make gifts to himself "in amounts not to exceed the annual federal gift tax exclusion to him or her, but only in the proportions authorized in [Albert's] will, trust, and other estate planning documents."

## D. 433 South Drive, Lebec, California (the "Subject Property")

The Trust specified a number of special gifts of real and personal property to be made upon Albert's death. One gift provision gave Maxine (i.e., Christopher's mother) the "right to occupy the property located at 433 South Drive, Lebec, CA [the "Subject Property"] for her lifetime or until she no longer wishes to occupy the property." Once Maxine passed away or chose to vacate the Subject Property, it was to be sold by the Trustee and the proceeds added to the Trust residue. Because Maxine predeceased Albert, the gift lapsed under the Trust.

On August 1, 2018, Kathy's attorney sent Christopher's attorney a letter requesting an inventory of assets held in the Trust estate and related information. On August 23, 2018, Christopher's attorney responded to Kathy's attorney. The letter including the following paragraph:

> "The Trustee has also indicated to me that there has been some interest on the part of some of the beneficiaries of purchasing one or more of the houses from the trust at fair market value. This includes the house currently occupied by the Trustee [i.e., the Subject Property]. (He has occupied if for some time with the permission of Albert …, who intended that he get the house, but felt unable to change the beneficiaries after his wife passed.) The Trust expressly permits this—and the Trustee too can purchase for fair market value. Should the Trustee determine in his discretion that a sale would be appropriate, he will retain a neutral, licensed professional appraiser to determine value…. Before any property is thus sold to a beneficiary, a copy of the appraisal will be sent to your client along with the other beneficiaries, so they have a chance to make a written objection supported by legally relevant facts if they desire."

On November 7, 2018, Christopher's attorney sent a letter to beneficiaries of the Trust. The letter included proposed dispositions of several Trust real properties including the Subject Property. As to the latter, the following proposal was made:

> "The Trustee has resided at [the Subject Property], for some time, with permission from the Settlors, who intended that it be his residence. It is my understanding that he has spoken with each of the beneficiaries, and

8.

they are willing to waive any interest in this property and consent that it be transferred to the Trustee.

"The Trustee obtained an appraisal from Michael Burger & Associates, a licensed appraiser. Mr. Burger is the Probate Referee for the County of Kern, and is responsible for valuing estates for the court. He has no personal connection to either myself or the [T]rustee, although obviously I have used him professionally on numerous occasions.

"I have enclosed the appraisal, which came in at $60,000.00.

"This letter serves as notice of the Trustee's intent to transfer this property to himself. Any objections need to be made in writing within 60 days of this letter, or the objection will be deemed waived."

On January 29, 2019, Christopher, in his capacity as Trustee deeded the Subject Property to himself by way of a grant deed. The grant deed was recorded on January 31, 2019, and contained the following notation: "Documentary transfer tax is $ 0.00. Distribution from Grantor Trust."

On February 12, 2019, Christopher's attorney wrote Kathy's attorney concerning efforts taken in managing the real property of the Trust. As to the Subject Property, the letter read:

"In the letter to the beneficiaries back in November, we gave notice of the intent to distributed [sic] this property to the Trustee. It was our understanding that all beneficiaries consented to this as being consistent with the decedent's wishes and because Christopher has resided there for years, maintaining the property. We received no objections, so that property was transferred as proposed."

## II. Procedural Background

### A. Pleadings and Interim Orders

On June 27, 2019, Kathy filed a Petition to Remove Trustee and to Appoint Successor Trustee, and for Current Trustee to File Accounting (unnecessary capitalization omitted) ("Removal Petition").

On November 5, 2019, Kathy filed a Petition to Suspend Trustee[']s Powers and Appoint an Independent Person [Prob[ate] Code [section] 15642] (unnecessary

capitalization omitted). That same day, Kathy also filed an Ex-Parte Application and Declaration to Suspend Trustee[']s Powers and Appoint an Independent Person [Prob[ate] Code [section] 15642] (unnecessary capitalization omitted).

Following the parties' briefing on Kathy's ex parte application, the probate court issued a minute order indicating it had granted the ex parte application to suspend Christopher's powers as Trustee. On February 21, 2020, the probate court issued a formal order suspending Christopher's powers as Trustee "pending the action." The formal order required, among other things, that Christopher's attorney provide the court with a "plan for the timeline for the distribution" of Trust assets, and authorized Christopher to "pay up to $2,000 for any ongoing expenses" but prohibited him from contacting Trust beneficiaries during his suspension.

On July 13, 2020, Kathy filed an Amended Petition to Surcharge Trustee for Breach of Trust; Petition to Determine Ownership of Assets and for Damages Pursuant to Probate Code Section 859 (unnecessary capitalization omitted) ("Surcharge Petition").

On August 25, 2020, the parties filed a stipulation in which they stipulated, among other things, that (1) Christopher would resign as Trustee without prejudice to his right to (a) contest the claims made in the Removal Petition and Surcharge Petition; (b) seek reimbursement of costs incurred as Trustee and to claim Trustee fees; (2) that the court should appoint an identified individual as successor Trustee (a) under specified terms of payment for successor Trustee fees and expenses; and (b) with a provision for the appointment of counsel for the successor Trustee under specified terms; (3) that the court authorize the successor Trustee to "sell all vacant real property … along with all vehicles and personal properties without further notice, petition, or hearing"; and (4) that Christopher will provide an accounting for the period preceding appointment of the successor Trustee. On September 1, 2020, the probate court accepted the parties' stipulation.

On October 14, 2020, Christopher filed objections to the Surcharge Petition. On October 28, 2020, Christopher filed his final accounting for the period he served as Trustee. On April 5, 2021, Kathy filed objections to Christopher's final accounting.

On July 6, 2021, Rachelle and Sharon joined in the Surcharge Petition brought by Kathy. The probate court granted the joinder but indicated they were bound by the pleadings and could not raise new issues.

**B.     *The Probate Court Granted, In Part, and Denied, In Part, the Relief Sought By Way of the Surcharge Petition***

Trial on the Surcharge Petition commenced on July 7, 2021.

On December 15, 2021, the probate court issued its Ruling and Order on Court Trial Regarding Amended Petition to Surcharge Trustee for Breach of Trust; Petition to Determine Trust Ownership of Assets and for Damages Pursuant to Probate Code Section 859; and Final Accounting by Former Trustee Christopher Guadarrama (unnecessary capitalization omitted) (i.e., the "subject order") from which Christopher appeals.

In the subject order, the probate court made the following findings and orders: (1) "[Christopher] is ordered to reconvey title of the [Subject Property] to the [T]rust[]"; (2) "[Christopher] shall be allowed [a] right of first refusal to buy the [Subject Property] at fair market value determined as of the date the court's order becomes final[]"; (3) "Double damages under Probate Code section 859 are denied[]"; (4) "The [joint account] is not a [T]rust asset[]"; (5) "[Christopher] is ordered to deliver $335,779 to [the new] [T]rustee … or any other duly appointed successor [T]rustee[]"; (6) "Trustee's fees are denied[]"; (7) "[Christopher's request for reimbursement of $4,017 in loan payments is denied[]"; (8) "[Kathy's] reasonable attorney's fees and costs shall be paid out of the [T]rust[]"; (9) "The [T]rustee shall deduct: the cost of cable, internet, utilities, and insurance expenses that were paid by the [T]rust from the distributive shares of the beneficiaries who benefitted; $2,198 for costs related to the Cadillac from Ratcliffe's

11.

distributive share; $440.00 for the cost of car covers from [Christopher's] distributive share[]"; (10) "[Kathy's] requests for reimbursement to the [T]rust of $3,279 in pet-related expenses and $11,955 in home repair costs are denied[]"; and (11) "[Kathy's] request that [Christopher] be ordered to pay $3,171 for Rachelle['s] … towing fees is denied."

On February 9, 2022, Christopher timely filed a notice of appeal challenging the subject order. On appeal Christopher challenges only certain aspects of the subject order, namely the orders and related findings: (1) requiring Christopher to reconvey title to the Subject Property to the new Trustee; (2) requiring Christopher to deliver $205,643 to the Trustee (i.e., a portion of the $335,779 he was ordered to deliver to the Trustee) to reimburse for two withdrawals taken from the joint account; (3) requiring Christopher to deliver $28,059 to the Trustee (again, a portion of the aforementioned $335,779) for other withdrawals taken from the joint account; (4) requiring Christopher to deliver $20,281 to the Trustee (the remaining portion of the aforementioned $335,779) for withdrawals made from the joint account to pay his attorney; and (5) denying Christopher fees for his service as Trustee. `

Additional facts relevant to Christopher's appeal are discussed below.

## DISCUSSION

### I.      Standard of Review

"Where findings of fact are challenged on a civil appeal, … 'the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.) We "view the evidence in the light most favorable to the prevailing party" and give that party "the benefit of every reasonable inference." (*Ibid.*) All conflicts in the evidence are resolved in favor of the prevailing party. (*Ibid.*) "[W]e do not reweigh the evidence." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581. (*Schmidt*).)

12.

Where the construction of a statute or written instrument is at issue, our review is de novo "unless the interpretation depends on the competence or credibility of extrinsic evidence or a conflict in that evidence." (*Pena v. Dey* (2019) 39 Cal.App.5th 546, 551.) "[I]n a bench trial, the trial court is the 'sole judge' of witness credibility." (*Schmidt, supra,* 44 Cal.App.5th at 582.) "Credibility determinations … are subject to extremely deferential review. (*Ibid*.)

## II. The Probate Court Did Not Err By Ordering Christopher to Reconvey the Subject Property to the Trustee

The terms of the Amended/Restated Trust are not in dispute. With regard to the Subject Property, the Trust provides, in relevant part: "Maxine … shall have a right to occupy the [Subject Property] for her lifetime or until she no longer wishes to occupy the property…. Upon the [*sic*] Maxine's death or her choice to vacate the premises, the [T]rustee shall sell the property and add the proceeds to the residue of the [T]rust." The Trust further provides that the gift shall lapse if Maxine does not survive Albert. Maxine did not survive Albert.

As discussed previously, instead of following the above provision, Christopher, through a November 7, 2018, letter written by his attorney, proposed that he transfer the property to himself. The letter advised its addressees that failure to object within 60 days of the letter would be deemed a waiver of any objection to the transfer. Having received no objections within that period of time, Christopher deeded the property to himself.

At trial, Christopher offered three defenses in support of his decision to transfer the Subject Property to himself. He contended that the Trust beneficiaries verbally consented to transfer; that his lawyer's November 7, 2018, letter constituted a notice of proposed action and the beneficiaries did not object; and that he relied on his counsel's advice in making the transfer.

The probate court found against Christopher on each of the aforementioned defenses. On appeal, Christopher contends that "[a]ny one of these defenses, if justified,

13.

would result in a lawful distribution of the property." However, Christopher only argues the court erred by failing to recognize that the transfer was lawful due to the beneficiaries' failure to object to his lawyer's November 7, 2018, notice of the proposed action. Consequently, he has forfeited any argument related to his remaining defenses in connection with his transfer of the Subject Property to himself.[3] (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 555 ["Issues not raised in an appellant's brief are deemed waived or abandoned."].)

With regard to the November 7, 2018, notice of proposed action, the probate court wrote: "[The attorney's] letter to the beneficiaries informing them that [Christopher] intended to distribute the house to himself unless they objected did not cure the breach. A trustee may not buy or exchange trust property through use of the notice of proposed action procedure. (Prob. Code, § 16501, subd. (d)(5), (6).)."[4] Section 16501 provides, in part: "Notwithstanding any other provision of this chapter, the trustee may not use a notice of proposed action in any of the following actions: [¶ … ¶] (5) Sale of property of the trust to the trustee or to the attorney for the trustee[; and ¶] (6) Exchange of property of the trust for property of the trustee or for property of the attorney for the trustee." (§ 16501, subd. (d)(5), (6).)

Christopher acknowledges section 16501 bars a trustee from using the notice of proposed action to effectuate a " 'sale' of trust property to himself …, or an 'exchange' of trust property for his own. … However, [he contends, it] pointedly does not bar use of

---

[3] Christopher does not challenge the probate court's finding that not all beneficiaries verbally consented to the transfer, that Christopher admitted he did not discuss the matter with beneficiary Heath Poff (Sharon's son), and that Rachelle credibly testified Christopher never discussed the matter with her. Nor does Christopher challenge the court's finding and determination that the advice of counsel defense is not applicable due to the fact Christopher told his counsel that all beneficiaries had consented to the transfer, which was not true.

[4] All statutory references are to the Probate Code unless otherwise noted.

14.

the procedure where a trustee seeks to 'distribute' property to himself." In support of his argument, Christopher notes that subdivision (a)(2) of the statute uses the term "distribution" whereas subdivision (d) does not.[5] Thus, he argues, "the [L]egislature made a deliberate choice to permit trustees to use the notice of proposed action mechanism to shield themselves from liability for making 'distributions' of trust property to themselves."

Christopher does not proffer any definitions for the terms "distribution," "sale," or "exchange" as used in section 16501. Aside from noting the varied use of the terms in section 16501, his argument is based solely on (1) his use of the term "distributed" in the grant deed he executed as Trustee to convey the Subject Property to himself; and (2) the probate court's use of the term "distribution" in the subject order to describe Christopher's conveyance of the Subject Property to himself. Christopher contends the court's use of the term twice on page 4, three times on page 6, and three times on page 7, constitutes a finding that the conveyance of the Subject Property was a distribution and not a sale or exchange of Trust property to himself.

Christopher's argument is not persuasive. The probate court used the term "distribution" in describing the conveyance on those specific pages, as follows: "[Kathy] asks that [Christopher] be surcharged for multiple alleged breaches of trust, including the *distribution* of … [the Subject Property] to himself[,]" (italics added). "[Christopher] states that the beneficiaries consented to his *distribution* of [the Subject Property] …[,]" (italics added). "[Christopher] never received any objections to the proposed *distribution*[,]" (italics added). "[Christopher] admitted during his testimony that he

---

[5] Subdivision (a)(2) of Probate Code section 16501 provides: "(a) The trustee who elects to provide notice pursuant to this chapter shall deliver notice pursuant to Section 1215 of the proposed action to each of the following: [¶ …¶] (2) A beneficiary who would receive a distribution of principal if the trust were terminated at the time the notice is given." (§ 16501, subd. (a)(2).)

15.

never spoke to beneficiary Heath Poff about consenting to the *distribution*[,]" (italics added). Rachelle … also testified that [Christopher] never discussed the *distribution* with her[,]" (italics added). "[Christopher's] *distribution* of [the Subject Property] to himself was unauthorized and a breach of trust[,]" (italics added). "[Christopher proffered the defense that] he relied on the advice of counsel in *distributing* the house to himself[,]" (italics added). "Rachelle … testified credibly that [Christopher] never discussed the *distribution* with her[,]" (italics added). "[Christopher's counsel's] letter to the beneficiaries informing them that [Christopher] intended to *distribute* the house to himself unless they objected did not cure the breach. A trustee may not buy or exchange trust property through the use of the notice of proposed action procedure[,]" (italics added).

"A court order is interpreted under the same rules for interpreting writings in general. [Citations.] The language of a writing governs if it is clear and explicit. But when it is susceptible 'to two interpretations, the court should give the construction that will make the [writing] lawful, operative, definite, reasonable and capable of being carried into effect and avoid an interpretation which will make the [writing] extraordinary, harsh, unjust, inequitable or which would result in absurdity.' [Citation.] Subsequent actions by the rendering judge may be considered as bearing upon the judgment's intended meaning and effect." (*In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 989.) "If an order is ambiguous, the reviewing court may examine the record for its scope and effect and may look at the circumstances of its making." (*In re Marriage of Samson* (2011) 197 Cal.App.4th 23, 27.)

It is clear from the subject order that the probate court did *not* find that Christopher was, as the language of the referenced statute provides, "[a] beneficiary who would receive a distribution of principal if the trust were terminated at the time the notice is given." (§ 16501, subd. (a)(2).) Nothing in the subject order suggests otherwise and to so interpret the subject order would result in absurdity. Unmistakably, the court found

16.

that Christopher's conveyance of the subject property was a "sale" or "exchange" as those terms are used in the statute. (*Id.,* at subd. (d).) That finding is supported by the court's finding that "[Christopher's] distribution of [the Subject Property] to himself was unauthorized and a breach of trust[]" and its order that he reconvey title to the property to the Trust. The court even cited subdivision (d)(5) and (d)(6) of section 16501 as authority for its determination that Christopher could not use the notice of proposed action procedure to cure the breach.

It is also evident that the term "distribution" in the subject order was largely used to describe how the litigants themselves described the conveyance. In those instances where the court used the term as an easy reference to the conveyance, it is clear that the court was not using the term to describe a distribution that complied with Trust provisions. The court was merely describing the process of conveying the asset from the Trust to Christopher, nothing more. Christopher does not proffer an alternative meaning for the word "distribution" and it is not the job of an appellate court to develop an appellant's arguments for him or her. (*Dills v. Redwoods Associates, Ltd.* (1994) 28 Cal.App.4th 888, 890, fn. 1.) The fact that Christopher used the term in the grant deed by which he conveyed the Subject Property to himself is irrelevant and of no moment. Christopher had no entitlement to the Subject Property under the terms of the Trust.

Finally, we note that the November 7, 2018, letter from Christopher's counsel in which he gave notice of the proposed action reads, in relevant part: "This letter is intended to be an update as to the status of the [T]rust, as well as notice of *intent to sell a property to the [T]rustee* for fair market value as provided in Paragraph 7.13 of the [T]rust[,]" (italics added). This is the very letter that Christopher relies upon in arguing he was entitled to the Subject Property. Similarly, the earlier letter from Christopher's attorney on August 23, 2018, indicated the notice of proposed action would follow if Christopher "determine[d] in his discretion that a sale [to Christopher] would be appropriate." Both the notice of proposed action sent to Trust beneficiaries and the

17.

prefatory letter sent to Kathy's attorney characterize the proposed action as a sale. A notice of proposed action may not be used to effectuate a "sale of property of the trust to the trustee …." (§ 16501, subd. (d)(5).)[6]

We affirm the probate court's disposition of the Subject Property in the subject order.

## III. The Probate Court Did Not Err In Ordering Christopher to Deliver Approximately $205,643 Plus Interest to the Current Trustee

As discussed, in the few months that preceded Albert's death, Christopher made two large deposits into the joint account in the amounts of $99,720.46 and $104,922.07 for a total deposit of $204,642.53 (the "subject funds"). Christopher could not provide any information concerning the deposits. He did not know the source of the funds and had no recollection of making the deposits. There were no discussions between Christopher and Albert concerning the funds.

Notably, Christopher treated money in the joint account as if it were money belonging to the Trust. He loaned money from the account to Mr. Ratcliffe and had Mr. Ratcliffe sign a promissory note in favor of the Trust. The probate court could have concluded this was an acknowledgment by Christopher that the subject funds in the joint account belonged to the Trust; and that, at the time he made the deposits, he did so with the belief he was properly allocating that money to the Trust. Substantial evidence supports such a finding. However, there are more compelling reasons to affirm the probate court's order with respect to the subject funds. As discussed below,

---

[6] Moreover, to the extent the conveyance of the Subject Property to Christopher was intended to be offset against his just entitlement under the Trust, if any, it would nonetheless qualify as an "[e]xchange of property of the trust for property of the trustee …." (§ 16501, subd. (d)(6).) A notice of proposed action cannot be used to effectuate such an exchange. (*Ibid*.)

18.

Christopher's deposit of the subject funds into the joint account was a breach of his fiduciary obligations as Albert's *attorney-in-fact*.

An attorney-in-fact is a fiduciary. (§ 39.) "The exercise of authority by an attorney-in-fact is subject to the attorney-in-fact's fiduciary duties." (§ 4266.) "[I]n dealing with property of the principal, an attorney-in-fact shall observe the standard of care that would be observed by a prudent person dealing with property of another …." (§ 4231, subd. (a).) "An attorney-in-fact has a duty to act solely in the interest of the principal and to avoid conflicts of interest." (§ 4232, subd. (a).) "The attorney-in-fact shall keep the principal's property separate and distinct from other property in a manner adequate to identify the property as clearly belonging to the principal." (§ 4233, subd. (a).) An attorney may comply with the obligation to keep the principal's property separate and distinct from other property "if the property is held in the name of the principal or in the name of the attorney-in-fact as attorney-in-fact for the principal." (§ 4233, subd. (b).) "The attorney-in-fact shall keep records of all transactions entered into by the attorney-in-fact on behalf of the principal." (§ 4236, subd. (a).) An attorney-in-fact is prohibited from making gifts of the principal's property, and from creating survivorship interest in the principal's property absent an express grant of such authority in the power of attorney. (§ 4264, subds. (c) & (e).)

Christopher did not adhere to his fiduciary duties in managing the subject funds. He failed to keep the deposits separate and distinct from other property and, instead, deposited the funds into an account that did not clearly identify the property as belonging to Albert. He did not avoid the conflict-of-interest that presented itself in depositing funds into a joint account to which Christopher had unfettered access in his *personal* (as opposed to fiduciary) capacity. He did not keep a record of the transactions involving the subject funds which were the two largest deposits ever made to the joint account as reflected in the record on appeal. Christopher's interest in the joint account was held in Christopher's individual capacity. That is, he was not named to the joint account in the

19.

capacity as attorney-in-fact for Albert. A prudent person acting as attorney-in-fact would have put the subject funds in an account that only Albert or his attorney-in-fact, *acting in such capacity*, could have accessed.

Importantly, the POA did not authorize Christopher to create a survivorship interest in subject funds by depositing them into the joint account. There is no evidence that Albert instructed Christopher to deposit the funds into the joint account, that Albert intended for this money to be deposited in the joint account, or that Albert knew the money was deposited into the joint account. The survivorship interest in the subject funds was created by Christopher at a time when Albert's health was failing and his death was likely imminent. Whether couched as a "gift" or the creation of a "survivorship interest," the act of depositing the subject funds into the joint account violated section 4264. (See § 4264, subds. (c) & (e).)

In *Schubert v. Reynolds*, the defendant was one of four daughters of the decedent. (*Schubert v. Reynolds* (2002) 95 Cal.App.4th 100, 102 (*Schubert*).) Approximately two months prior to the decedent's death, the decedent executed a power of attorney appointing the defendant as his attorney-in-fact. (*Ibid.*) The day before the decedent died, the defendant, in her capacity as attorney-in fact, created an inter vivos trust which she executed as both trustor and trustee. (*Ibid.*) The inter vivos trust created in the defendant a life estate in the decedent's house to the exclusion of her sisters and contrary to the decedent's will. (*Id.* at pp. 102, 104.) The plaintiff (i.e., the defendant's sister) filed suit for declaratory relief and constructive trust. (*Ibid.*) The matter was tried and a judgment issued declaring the inter vivos trust invalid. (*Id.* at p. 103.) The appellate court affirmed the judgment. (*Id.* at p. 110.) The appellate court, like the trial court before it, concluded that subdivision (f) of section 4264 prohibited the creation of the trust because it "constituted an attempt to change the beneficiary designation, as established under either the 1988 will or the laws of intestate succession. (*Schubert*, at p. 104.)

Similar to *Schubert*, Christopher's deposit of the subject funds into the joint account amounted to an attempted change in the beneficiary designations under Albert's will and the Trust. This violated subdivision (f) of section 4264 which provides, absent an express grant of authority in a power of attorney, an attorney-in-fact is prohibited from "[d]esignat[ing] or chang[ing] the designation of beneficiaries to receive any property … on the principal's death." (§ 4264, subd. (f).) But for the fact the subject funds were deposited into the joint account, the monies would have passed to the Trust by virtue of Albert's pour-over will.

Moreover, even had Albert orally approved Christopher's deposit of subject funds into the joint account, Christopher would not be entitled to them. In *Estate of Huston*, the petitioner was the attorney-in-fact for the decedent. (*Estate of Huston* (1997) 51 Cal.App.4th 1721, 1723 (*Huston*).) Prior to decedent's death, the decedent verbally instructed the petitioner to purchase an annuity with a certificate of deposit that would be maturing soon. (*Id.* at p. 1724.) The decedent wanted to provide for the petitioner and it was agreed between them that the decedent would receive the annuity payments during her lifetime and that the annuity would pass to the petitioner upon her death. (*Ibid.*) The petitioner, in his capacity as attorney-in-fact, used the certificate of deposit proceeds to purchase the annuity and instructed the bank as to the decedent's wishes concerning annuity payments during her lifetime and that it would pass to the petitioner on decedent's death. (*Id.* at pp. 1724–1725) After the decedent died, the petitioner learned that the annuity had not been structured in accordance with the decedent's wishes. (*Id.* at p. 1725.) The petitioner, in his individual capacity, then filed a petition to determine ownership of the annuity. (*Id.* at p. 1723.) A residuary beneficiary under the decedent's will opposed the petition on grounds the power of attorney expressly prohibited the petitioner from making gifts to himself. (*Id.* at p. 1726) The trial court, "as sole judge of the credibility of witnesses," accepted the petitioner's testimony concerning the details of

21.

the transaction, and entered an order holding that the decedent's estate held the annuity in trust for the petitioner. (*Id*. at pp. 1725–1727.)

On appeal, the appellate court determined "substantial evidence … support[ed] the trial court's findings that the annuity was purchased with the decedent's knowledge, consent, and approval. (*Huston*, *supra*, 51 Cal.App.4th at p. 1727.) Notwithstanding, the court reversed the judgment. (*Id*. at p. 1728.) Relying on section 4264, subdivision (c), which prohibits an attorney-in-fact from making a gift of the principal's property to himself absent express authorization in the power of attorney, the appellate court determined the gift was void because it was outside the scope of the power of attorney. (*Id*. at pp. 1726–1727.) The court then considered "whether decedent's oral assent to the gift served to ratify the transaction and make the gift valid." (*Id*. at p 1727.) The court held it did not. (*Ibid.*) It wrote, " '[a] power of attorney is a written authorization to an agent to perform specified acts on behalf of the principal. [Citation.]' The rights and liabilities created by such authority are centered in the law of agency. [Citations.]" (*Ibid.*) "Because a power of attorney must be in writing, any act performed by the agent acting under the power of attorney must therefore be ratified in writing to be valid." (*Ibid.*) The court held that, despite the fact the evidence showed the decedent wished to make the gift, the gift was void for failure to comply with necessary formalities. (*Ibid.*)

Here, even had evidence existed to demonstrate that Albert wanted Christopher to have the subject funds, the lack of any written document authorizing Christopher to deposit the monies into the joint account would be fatal to Christopher's appeal concerning the subject funds.

We conclude Christopher's deposit of the subject funds in the amount of $204,642.53 violated section 4264, subdivision (e) by creating a survivorship interest in the subject funds in his favor. Christopher's deposit of the subject funds violated section 4264, subdivision (f) by effectuating a change in the designation of beneficiaries who would have otherwise shared in the entitlement to the subject funds. Finally,

22.

Christopher's deposit of the subject funds was tantamount to gifting the funds to himself in violation of section 4264, subdivision (c).

Section 4231.5 provides, in part: "If the attorney-in-fact breaches a duty pursuant to [division 4.5 of the Probate Code pertaining to powers of attorney], the attorney-in-fact is chargeable with any of the following, as appropriate under the circumstances: [¶] (1) Any loss or depreciation in value of the principal's property resulting from the breach of duty, with interest." Given our determination that Christopher violated section 4264 which is part of division 4.5 of the Probate Code, we see no error in the probate court having ordered Christopher to deliver these sums plus interest to the current Trustee.

We agree with Christopher, however, that a transpositional error occurred in the amount of the subject funds. The probate court indicated the amount of those deposits was $205,643. The evidence, however, demonstrates without contradiction that the amount was actually $204,642.53. Thus, we remand the matter to the court to correct the sum of, and interest attributable to, the subject funds and, with that modification, affirm the court's order with respect to those funds.

## IV. The Probate Court Did Not Err In Ordering Christopher to Deliver to the Current Trustee Sums that Were Withdrawn From the Joint Account During Albert's Lifetime Plus Interest Thereon

### A. The Probate Court Did Not Err in Ordering Christopher to Deliver $28,059 Plus Interest to the Current Trustee

The probate court found that Christopher withdrew $42,059 from the joint account prior to Albert's death on February 28, 2018, in violation of the POA and "the law concerning joint tenancy accounts." The POA only allowed Christopher to make gifts to himself "in amounts not to exceed the annual federal gift tax exclusion …, but only in the proportion authorized in [Albert's] will, trust, and other estate planning documents. The court determined, and the parties do not dispute, the amount of the annual gift tax exclusion in 2017 was $14,000. The court further determined Christopher "was entitled

23.

to just one-seventh of 17 percent of the [T]rust residual, plus one-half of Maxine's 16.6 [percent] share, under the [Amended/Restated Trust]."

On appeal, Christopher argues the court erred by impliedly finding Albert did not give Christopher permission to make the withdrawals, a finding that is not supported by the evidence. Rather, Christopher argues, the only evidence in the record demonstrates Albert wanted Christopher to "own all of the joint account funds after Albert's death" and that if Christopher had "not withdrawn the funds prior to Albert's death, he would have inevitably acquired them by operation of the right of survivorship." Christopher does not contend the withdrawals were for Albert's benefit. He only contends that the evidence demonstrates Albert wanted all the money in the joint account to pass to Christopher.

Respondents counter that "[a]n attorney-in-fact has a duty to act solely in the interest of the principal and to avoid conflicts of interest," quoting section 4232, subdivision (a). Respondents contend Christopher used the $42,059 on himself and for his own benefit. Respondents argue "when a fiduciary's actions are questioned, the fiduciary has the burden of proof to justify his actions," citing *Purdy v. Johnson* (1917) 174 Cal. 521, 527. (See *ibid.* ["Trustees are under an obligation to render to their beneficiaries a full account of all their dealings with the trust fund [citation], and where there has been a negligent failure to keep true accounts, or a refusal to account, all presumptions will be against the trustee upon a settlement."]; *LaMonte v. Sanwa Bank California* (1996) 45 Cal.App.4th 509, 517 (*LaMonte*) ["The beneficiary of the trust has the initial burden of proving the existence of a fiduciary duty and the trustee's failure to perform it; the burden then shifts to the trustee to justify its actions."].) Respondents further note there is no evidence that Albert permitted the withdrawals.

Undoubtedly, Christopher, as attorney-in-fact, had a fiduciary duty to Albert under the POA. (§§ 39, 4266.) Moreover, Christopher's withdrawals from the joint account during Albert's lifetime were, as admitted by Christopher, performed in his capacity as attorney-in-fact. An attorney-in-fact is required to avoid conflicts of interest (§ 4232,

subd. (a)); has a duty to "keep records of all transactions entered into by the attorney-in-fact on behalf of the principal" (§ 4235, subd. (a)); and is precluded from making gifts to himself absent an express grant of authority (§ 4264, subds. (c)). As noted, Christopher's authority to make gifts to himself was limited to the federal gift tax exclusion of $14,000.

Conversely, had Christopher left the withdrawn funds in the joint account and, assuming Albert would not have withdrawn the funds from the account, they would have passed to Christopher by right of survivorship. The California Multiple-Party Accounts Law (CMPAL) (§ 5100 et seq.) provides, in part: "An account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each, unless there is clear and convincing evidence of a different intent." (§ 5301, subd. (a).) "Sums remaining on deposit at the death of a party to a joint account belong to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intent...." (§ 5302, subd. (a).)

Only Albert's money was deposited in the joint account. Thus, during Albert's lifetime, the money in the joint account belonged to Albert alone. (§ 5301.) Christopher's personal withdrawals from the joint account during Albert's lifetime were, according to Christopher, performed under the authority of the POA. Under the POA, however, he was limited from making gifts to himself in excess of $14,000, the federal gift tax exclusion. There is no evidence Albert approved the withdrawals or an increase in the gift amount limitation. Thus, Christopher's withdrawals from the account in excess of $14,000 were outside his authority under the POA. Although he had the *power* to withdraw from the joint account by virtue of the fact he was a joint holder of the account, he did not have the *right* to make the withdrawals as attorney-in-fact absent express written authorization. (*Huston*, *supra*, 51 Cal.App.4th at p. 1727 ["any act performed … under the power of attorney must … be ratified in writing to be valid"].) We agree with respondents that it was incumbent on Christopher to demonstrate

sufficient authorization for the withdrawals but the record is lacking any such evidence. (See *LaMonte, supra,* 45 Cal.App.4th at p. 517.)

We now turn to Christopher's contention that he would have been entitled to the sums withdrawn upon Albert's death had he not withdrawn them. The problem with Christopher's contention is that he did withdraw the sums from the joint account. In doing so, he not only violated his fiduciary duties to Albert, but he also removed the funds from the very source that would have given him a right of survivorship in the funds—the joint account. Having wrongfully removed the sums from the joint account during Albert's lifetime, Christopher essentially stood in the position of a constructive trustee of the funds for the benefit of Albert or, following Albert's death, his heirs. He effectively extinguished any right of survivorship in the funds that he might have otherwise had by withdrawing them from the joint account.

We conclude the probate court did not err in ordering Christopher to deliver $28,059 plus interest in the amount of $9,821, to the current trustee as a result of the aforementioned withdrawals.

### B.    The Probate Court Did Not Err in Offsetting the Gift of $14,000 Christopher Made to Himself From Christopher's Share as Trust Beneficiary

Christopher challenges the subject order to the extent it provides that the $14,000 gift that Christopher was authorized to make, and did make, to himself from the joint account "be deducted from his distributive share" of the Trust. He argues the probate court's determination "is contrary to the court's finding that the joint account 'is not a [T]rust asset.' "

The POA provides, in part: "Notwithstanding any other provision in this Power, my attorney in fact may make gifts in amounts not to exceed the annual federal gift tax exclusion to him or her, *but only in the proportions authorized in my will, trust, and other estate planning documents*[,]" (italics added). Christopher argues this provision "does not mean that such gifts must be made from trust assets. It merely limits the amount of

such gifts to the 'proportions' authorized in the [T]rust. Because the $14,000 was not a trust asset, ordering it to be deducted from [Christopher's] distributive share would result in an unmerited windfall for the other beneficiaries."

Here, the record is silent concerning the meaning of the italicized language in the preceding paragraph. However, the POA's limitation that gifts may only be made in proportion to the dispositions made in Albert's will, trust and other estate planning documents, evidences a clear intent on the part of Albert, as principal, to protect the interests of his devisees and Trust beneficiaries in their inheritances.

We disagree with Christopher's contention that the probate court's order that the $14,000 gift be deducted from Christopher's distributive share of the Trust is inconsistent with the court's determination that the joint account is not a Trust asset. Once the gift was made, it was no longer part of the joint account. The court's determination that the joint account is not a Trust asset did not affect monies that were no longer part of the joint account at the time of Albert's death.

We conclude the probate court did not err in ordering the $14,000 gift be deducted from Christopher's distributive share of the Trust.

V.     **Christopher's Remaining Claims Are Denied**

Christopher contends that, in the event this court finds in his favor on any of the above matters, it should reverse the probate court's denial of Christopher's request for Trustee fees and denial of his request for attorney fees. Because we have not found in Christopher's favor on any of the matters above—with the minimal exception of acknowledging the need to correct a transpositional error—we decline Christopher's invitation to reverse the court's orders with regard to his request for Trustee fees and attorney fees.

DISPOSITION

To the extent the subject order of the probate court included an order that Christopher deliver to the current Trustee of the Trust "$205,643, plus interest of

27.

$71,975, calculated at ten percent over 3.5 years," we remand the matter to the probate court to modify the subject order by correcting the stated principal sum from $205,643 to $204,642.53, and recalculating the interest thereon based on the corrected principal sum.

All other sums ordered delivered to the current Trustee are affirmed in the amounts stated in the subject order and, together with the recalculated sums referenced above, are to be delivered to the current Trustee. All remaining provisions of the subject order are affirmed.

With the modification referenced above, the subject order is affirmed in its entirety. Costs on appeal are awarded to respondents Kathy Pool-O'Connor, Rachelle Lapham and Sharon Whiteside.

SNAUFFER, J.

WE CONCUR:


LEVY, Acting P. J.


DE SANTOS, J.